Elizabeth HALLGRING, Plaintiff,

v.

John J. CALLAHAN, Acting Commissioner of the Social Security Administration, Defendant.

Civil Action No. 97–10025–RCL.

United States District Court,
D. Massachusetts.

Aug. 14, 1997.

Vida K. Berkowitz, McDonald & Associates, West Newton, MA, for Plaintiff.

Lori J. Holik, U.S. Atty.'s Office, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER*

LINDSAY, District Judge.

The plaintiff Elizabeth Halligring (the "claimant") seeks judicial review of a final decision of the Acting Commissioner of Social Security (the "Commissioner")[1] denying her

1. Before March 31, 1995, actions for judicial review of the denial of Social Security benefits were prosecuted against the Secretary of Health and Human Services (the "Secretary"). Public Law 103–296, the Social Security Independence and Improvements Act of 1994, established the Social Security Administration as an independent agency in the executive branch to adminis- ter, among other things, the disability insurance and the supplemental security income programs under the Social Security Act. Public Law 103–296 also established the Commissioner as the public officer responsible for the exercise of all powers and the discharge of all duties of the Social Security Administration. The functions of the Secretary with respect to the disability insur-

claim for disability insurance benefits (SSD) and supplemental security income (SSI) benefits.

## I. Procedural Background

The claimant first applied for SSI on February 19, 1993, and for SSD on March 22, 1993, claiming in both applications that she had been disabled since October 15, 1992 due to chronic pelvic pain, fibromyalgia, and chronic fatigue syndrome (sometimes referred to herein as "CFS"). The Social Security Administration denied both applications on April 16, 1993 and, following a reconsideration of that action, denied the applications again on July 22, 1993. The claimant then filed a timely request for a hearing on her claims before an administrative law judge ("ALJ"). The request was granted and a hearing on the claims was held on April 20, 1994. At that hearing, the claimant was represented by counsel, and oral testimony was given by the claimant and a vocational counselor. In a decision issued May 11, 1995, the ALJ denied the claims, finding that the claimant, although suffering some physical impairment, was not disabled in her capacity to perform the full range of sedentary work. On November 8, 1996, the Appeals Council denied the claimant's request for review of the ALJ's decision. That decision thus became the final decision of the Commissioner.

## II. The Record As It Relates to the Claimant's Medical History

The record developed before the ALJ shows that the claimant had an unremarkable medical history until approximately 1989. In that year, she began a gradual physical and mental decline, characterized by fatigue and general weakness, intermittent fevers, right-side abdominal pain, joint pain and weight loss. In the fall of 1992, the claimant, then thirty-two years old, entered graduate school at the University of Rhode Island to work toward a doctoral degree in clinical

psychology.[2] Over the next several months she was treated by a number of physicians for abdominal pain, vaginal discharge, joint pain, low-grade fever and fatigue. Despite having seen several physicians, the claimant was given no definitive diagnosis of her condition during the fall and winter months of 1992. Among the diagnoses rendered during that period were pelvic inflammatory disease, hypothyroidism and fibromyalgia. The difficulty in diagnosis arose because of the inability of the physicians to find a single cause for the constellation of the claimant's symptoms in the laboratory tests and physical examinations they performed. Those symptoms consistently included fatigue, and some of the physicians who treated the claimant began to suspect that she was suffering from chronic fatigue syndrome. By December 20, 1992, the claimant's symptoms of joint pain, fevers, and especially chronic fatigue had not resolved and appeared to her to be worsening. As a result, she discontinued her doctoral studies.

Beginning in October, 1992, and continuing through June, 1993, the claimant was treated by a psychiatrist, Dr. Prudence Allen, who noted in a July 9, 1993 report: "In the face of her continuing physical disability, uncertain diagnosis, inability to work or even function in everyday home activities, [the claimant] became clinically depressed in the spring of '93." Record at 214. Dr. Allen also noted that "fatigue remains the most permanent and problematic [of the claimant's] symptoms—she simply does not have the energy to do more than basic ADL & to get to her various medical appointments." Id.

Beginning on May 13, 1993 and continuing to at least the time of the ALJ's decision, the claimant was under the care of Carol Englender, a physician, board-certified in family practice. In a report dated August 3, 1993, Dr. Englender noted that the laboratory tests for the claimant were, for the most part, within normal limits. A physical exami-

---

ance and supplemental security income programs under the Social Security Act were transferred to the Commissioner, effective March 31, 1995. Accordingly, the present action for judicial review is prosecuted against the Commissioner.

2. Her employment history, before entering graduate school, included work as a research assistant and as an administrative assistant in an art gallery.

nation of the claimant revealed that the claimant was "markedly positive for severe hyperesthesia around her joints with residual burning after pressure is relieved" and that the claimant showed tenderness "over the duodenal area without rebound." Record at 237. The report notes that the claimant reported fatigue so severe she could not manage self-care on some days, and that the claimant had trouble with both her long-term and short-term memory and her concentration. Record at 236–37. At the time, the claimant was being treated with a number of medications and with nutritional supplements to increase her energy level. *Id.* Dr. Englender diagnosed the claimant as having chronic fatigue syndrome and opined that she was unable either to attend school or work. That disability, in Dr. Englender's view, could be expected to last for at least eight to twelve months and perhaps for "a far longer time." Record at 238.

In a report dated April 14, 1994, Dr. Englender noted that the claimant was able to lift and carry five to ten pounds of weight occasionally; that her fine motor skills were present, but that weakness prevented gross motor activity that would involve arm control; and that the claimant's status had not improved in the year that Dr. Englender had treated her. Record at 256–57. Again, the claimant's laboratory studies were largely normal. Record at 255. Dr. Englender's opinion as of April 14, 1994 was that the claimant was "totally and permanently disabled from any kind of gainful employment or any kind of complete functioning in the activities of normal daily living" by reason of chronic fatigue syndrome. Record at 256.

In a report dated March 1, 1995, Dr. Englender noted that the claimant "has met and continues to meet the Center for Disease Control (CDC) diagnostic criteria for chronic fatigue syndrome" in all respects. Record at 315–16. She noted also that, as of March, 1995, the claimant continued to experience, among other things, severe fatigue to the point of exhaustion; low-grade fever; generalized aching; confusion and difficulty in remembering, concentrating and learning and retaining new materials. Record at 316.

She noted as significant laboratory findings the following:

Significant laboratory findings are a lower GI series and bowel x-ray showing enlarged intestinal lymph nodes, a colon biopsy showing atypical lymphoid hyperplasia; a stomach biopsy showing erosive, hemorrhagic gastritis and duodenitis; delayed sensitivities to a number of foods (IgG RAST) which is associated with the up-regulation component of CFS manifested by reactivity to foods and chemicals in a large number of patients; and evidence of past varicella zoster virus infections, reactivation of which may be associated with burning sensations in CFS patients.

Record at 316–17. Dr. Englender also stated

Ms. Hallgring's symptoms are present on a daily basis. Although on good days she is able to sustain activity for 2–3 hours at a time, and can drive a car or attend a meeting intermittently her ability to do so is unpredictable. It is predictable, however, that if she engages in such activity on one day, she will be unable to do so the following day. She has not had a week without at least two bad days.

.  .  .  .  .

She must be able to rest, lying down as needed, for up to two to three hours at a time and would typically need to rest after working for an hour or two.

Record at 317. It remained Dr. Englender's opinion that the claimant was suffering from chronic fatigue syndrome and would, for that reason, remain totally disabled for the foreseeable future. *Id.*

Following the hearing on the claim, the ALJ referred the claimant to Dr. Jill Goldman for an independent evaluation. Dr. Goldman, in a report dated May 23, 1994, noted the claimant's medical history, which by that time included diagnoses of congenital adrenal hyperplasia, thyroiditis, presumptive pelvic inflammatory disease, pelvic adhesions, head tremor and chronic fatigue syndrome. Record at 267. The report noted no unusual findings upon physical examination (including some neurological testing) of the claimant. Record at 266–67.

Dr. Goldman herself did not offer any opinion as to the claimant's condition or as to her physical limitations. She did include, with her report, a physical capacities assessment completed by Dr. Alan Balsam on June 3, 1994.

Dr. Balsam is certified by the American Board of Internal Medicine in internal medicine and endocrinology and metabolism. Dr. Balsam did not examine the claimant, but based his findings on his review of certain medical reports in the claimant's Social Security Administration file (discussed below). Record at 279. Dr. Balsam did not prepare a written narrative report, but instead placed check marks, as he thought appropriate, in blocks on what appears to be a printed form of the Social Security Administration. Record at 269. The only narrative comment he made on the form was that the "[f]atigue & fibromyalgias [experienced by the claimant] tend to wax and wane." *Id.* As to the claimant's physical capacities, Dr. Balsam checked blocks that indicated his opinion that the claimant was able to sit, stand and walk up to seven hours in a work day; that she could occasionally lift and carry up to 100 pounds; that she could frequently lift and carry up to twenty pounds; and that she could continuously lift and carry up to ten pounds. *Id.*

Dr. Balsam did not testify at the hearing. The claimant's "cross examination" of Dr. Balsam was limited to the submission to him of written interrogatories. Dr. Balsam's answers to those interrogatories reveal that his opinion as to the nature and limitations of the claimant's condition was based entirely upon the written reports and clinical notes of Dr. Englender and Dr. Goldman's report (including the absence of abnormal findings by Dr. Goldman on physical and neurological examination of the claimant). His conclusion that the claimant could sit, stand and walk continuously for seven hours during an eight-hour day and his conclusions concerning her capacity to lift various weights were based upon the "absence of any history of difficulties in that respect."[3]

The record also contains a residual physical functional capacity assessment made by Dr. Mortimer S. Greenberg, a board-certified physician in internal medicine. Dr. Greenberg noted his assessment of the claimant on a printed form not unlike that completed by Dr. Balsam. Record at 91. The form appears to have been completed on April 9, 1993, and indicates Dr. Greenberg's opinion that, at that time, the plaintiff could occasionally lift up to twenty pounds, that she could sit up to six hours a day, stand up to two hours a day, and that she could perform sedentary work if she rested between fifteen to thirty minutes after lunch. Record at 92. On June 24, 1993, another physician, Dr. Douglas Poirier "affirmed as written," the assessment made by Dr. Greenberg. Record at 98. Both physicians gave chronic fatigue syndrome as the diagnosis of the claimant's illness.

Neither Dr. Greenberg nor Dr. Poirier examined the plaintiff. The form that Dr. Greenberg used and that Dr. Poirier "affirmed as written" required that the conclusions stated in the form be based "on all evidence in the file." Record at 91. There is nothing in the record, however, to show what "evidence in the file" these physicians actually reviewed in reaching their conclusions. In any case, they did not have the advantage of any medical information concerning the claimant developed after June 24, 1993.

The record also contains an assessment of the claimant's mental residual functional capacity prepared as of July 15, 1993, prepared by J. Cormier, Ph.D.[4] As with Drs. Balsam

---

3. It thus appears, in this connection, that Dr. Balsam failed to notice the observation made by Dr. Englender, in her August 3, 1993 report, that when the claimant lifted her twenty-pound godchild for three or four minutes, she was severely fatigued for an hour thereafter (Record at 235) or Dr. Englender's observation, in her April 14, 1994 report, that the claimant was able to lift and carry only five to ten pounds and then only on occasion. Record at 257. Moreover, when Dr. Balsam noted in his evaluation that the

claimant could use her hands for repetitive actions, such as pushing and pulling of arms, he apparently failed to note that, in Dr. Englender's report of April 14, 1994, Dr. Englender states that "weakness prevents gross motor activity that would involve arm control." *Id.*

4. Dr. Cormier's professional qualifications do not otherwise appear in the record. Indeed the record does not reveal Dr. Cormier's full name.

and Greenberg, the assessment was made on what appears to be a printed form on which Dr. Cormier gave opinions by putting check marks in boxes. It does not appear from the record that Dr. Cormier examined the claimant. Nor does the record establish the basis on which Dr. Cormier reached his/her conclusion.[5] In any case, those conclusions were:

> Depression does not significantly limit [the claimant's] functioning but concentration is impaired at times of increased pain. She has no difficulty getting along with others or adhering to the requirements of a work setting except for those limitations due to physical factors.

Record at 111.

The record indicates that the claimant also saw a gastroenterologist, Dr. Rosaline F. Barron, and a hematologist, Dr. Lisa B. Weissmann, in 1994. Each physician pronounced herself puzzled by the claimant's symptoms, but neither physician could find within her particular specialty any cause for the broad range of symptoms of which the claimant complained. Record at 309–14. Dr. Weissmann did offer the thought that the claimant's symptoms might have either an immunologic or endocrinologic cause. Record at 313.

### III. Vocational Evidence

Louis Joseph Testa, a vocational counselor, testified at the hearing before the ALJ that he had reviewed the claimant's file and had concluded that, given the claimant's condition, as it existed at the time of the hearing, she could not perform any of the jobs she had performed in the past. Record at 71. The ALJ put to Mr. Testa a hypothetical question, in which the ALJ asked Mr. Testa to assume that the degree of fatigue or exhaustion experienced by the claimant was not as great as she described it, but was only "mild to moderate."[6] Record at 72. In response, Mr. Testa testified that there were between 16,000 and 18,000 clerical jobs within the Boston area or within seventy-five miles of Boston for which the claimant was qualified. Id. The jobs to which he referred were "work as a receptionist, different type [sic] of clerk jobs[,] working on computers, billing clerks, ... statement checkers, invoice clerks, billing clerks, those types of jobs, with some receptionist work, I think already mentioned administrative assistant work." Id.

### IV. The ALI's Decision

The ALJ considered the claimant's recorded medical history from 1992 through the March 1, 1995 report of Dr. Englender, including the various residual functional assessments. He also considered the testimony of the claimant herself, the testimony of Mr. Testa and the post-hearing reports of Drs. Goldman and Balsam (including Dr. Balsam's answers to the claimant's interrogatories).

The ALJ discounted heavily Dr. Englender's consistent assessment of the plaintiff's total disability in light of the few abnormal findings reported on physical examinations and in laboratory studies[7] of the claimant. Record at 22. Dr. Englender's opinions, the ALJ said, were "necessarily based primarily on the claimant's description of her symptoms and resulting incapacity." Record at 22. He likewise discounted the plaintiff's own testimony concerning the degree of her incapacity, based on his view that the medical records showed that no examining physician had ever recorded that the claimant appeared fatigued, and on his observations of

---

5. The record does not reveal whether Dr. Cormier is male or female.

6. The ALJ did not define or otherwise explain what he meant by "mild to moderate."

7. It is true that the record contains evidence of few laboratory studies that confirm the presence of chronic fatigue syndrome in the claimant. The record does, however, contain laboratory findings which Dr. Englender thought were consistent with CFS:

> delayed sensitivities to a number of foods (IgG RAST) which is associated with the up-regulation component of CFS manifested by reactivity to foods and chemicals in a large number of patients; and evidence of past varicella zoster virus infections, reactivation of which may be associated with burning sensations in CFS patients.

Record at 316–17.

the claimant at the hearing.[8]

Although the ALJ discounted, as too optimistic, Dr. Balsam's assessment that the plaintiff could lift up to 100 pounds (Record at 23), he appears to have relied upon Dr. Balsam's assessment that the plaintiff's only limitations were in the area of lifting more than twenty pounds and in activities like bending, squatting and climbing. Record at 19.

The ALJ said that he "did not doubt that the claimant has chronic fatigue syndrome, and that she is seriously impaired." Record at 22. Indeed, he specifically found that the claimant suffered chronic fatigue syndrome as well as fibromyalgia and gastrointestinal disorders. Record at 24. He concluded, however, that the record did not support a finding of such incapacity as would preclude all substantial, gainful activity. Record at 22. He found instead that the claimant "could tolerate simpler, physically and mentally less demanding work" than the work she had done in the past. *Id.* Indeed, he found that the claimant had the residual functional capacity to perform the full range of sedentary work. Record at 25. He thus determined that the claimant was not disabled within the meaning of the Social Security Act and the regulations promulgated pursuant to the Act and codified at 20 C.F.R. § 404.1520.

## V. *Discussion*

■ The ALJ's decision (which, in this case, as noted above, is the final decision of the Commissioner) as to the claimant's disability is a finding of fact. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evi-

dence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, a district court "must uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 222 (1st Cir.1981). The question thus presented to this court is whether there is substantial evidence in the record to justify the ALJ's findings of no disability.

■ As noted above, the ALJ found that, although the claimant suffered from chronic fatigue syndrome, fibromyalgia and gastrointestinal disorders and that she was seriously impaired, the complete incapacity for gainful employment the claimant alleged was not supported by the record. He based that determination on the fact that there had been few abnormal laboratory or physical findings on repeated examination of the claimant, on his assessment that the claimant's medical history contained no recorded observation of fatigue, on the claimant's appearance at the hearing, and on Dr. Balsam's physical capacity evaluation. As discussed below, this evidence, taken as a whole, does not constitute substantial evidence to support the finding of no disability the ALJ made.

The reliance by the ALJ on the absence of abnormal laboratory and physical findings in the claimant's medical history is misplaced.[9] A chronic fatigue syndrome "primer", entitled *Chronic Fatigue Syndrome: A Primer For Physicians and Allied Health Professionals* (the "*CFIDs Primer*"), written by a number of health-care professionals [10] who comprise the Health Professionals Commit-

---

**8.** The ALJ also adverted, in his decision, to testimony of the claimant that her condition improved after the first few months of acute symptoms. What the claimant actually said was that while there was improvement in some of her various symptoms after the first few months of onset, "the fatigue didn't leave and kept getting a little worse as time went on." Record at 62. Moreover, that the claimant testified that her condition improved is not dispositive of the question of whether she is nevertheless disabled.

**9.** Of course, as the court pointed out in footnote 7 of this memorandum and order, the record is not totally devoid of laboratory findings consistent with the claimant's symptoms of chronic fatigue syndrome. There is no need to belabor the point, however, because the ALJ has found that the claimant does suffer from chronic fatigue syndrome, and the question now is how incapacitated she is as a result of the disease.

**10.** The health-care professionals included several physicians, several nurses and a licensed social worker.

tee of the Massachusetts CFIDS[11] Association was made part of the record. Record at 318–36. The research results, opinions and conclusions of the *CFIDs Primer* are not contradicted by any other evidence in the record; nor are they questioned or challenged in any way in the ALJ's decision. Of particular note, for present purposes, is the *CFIDs Primer's* conclusion that there are no laboratory tests and no unequivocal physical findings that can be made to determine the presence of chronic fatigue syndrome, and that "[r]outine [laboratory] studies may be normal and are not required to satisfy the definition of [chronic fatigue syndrome]." Record at 324, 325.

Moreover, beginning in November, 1993 and continuing to the present, the Social Security Administration has had a policy regarding chronic fatigue syndrome. That policy, in pertinent part, states:

Chronic Fatigue Syndrome (CFS), previously known as Chronic Epstein–Barr Virus Syndrome, and also currently known as Chronic Fatigue and Immune Dysfunction Syndrome, is a systemic disorder consisting of a complex of variable signs and symptoms which may vary in duration and severity. The etiology and pathology of the disorder have not been established. Although there are no generally accepted criteria for the diagnosis of cases of CFS, an operational concept is used by the medical community. There is no specific treatment and manifestations of the syndrome are treated symptomatically.

CFS is characterized by the presence of persistent *unexplained fatigue* and by the chronicity of other symptoms. *The most prevalent symptoms include episodes of low-grade fever, myalgias, headache, painful lymph nodes and problems with memo-*

*ry and concentration.* These symptoms fluctuate in frequency and severity and may be seen to fluctuate over a period of many months. *Physical examination may be within normal limits.*

Program Operations Manual System ("POMS"), section DI 24575.005 (November, 1993 –May, 1997) and section DI 24515.075 (May, 1997) (emphasis added).[12]

The First Circuit has noted that the POMS demonstrates that the Social Security Administration has accepted certain verities concerning the nature and medical diagnosis of chronic fatigue syndrome. One of these is that "there is no 'dipstick' laboratory test for chronic fatigue syndrome ... so the disease is not 'per se excluded from coverage because it cannot be conclusively diagnosed in a laboratory setting.'" *Rose v. Shalala,* 34 F.3d 13, 17 (1st Cir.1994) (*quoting Sisco v. Department of HHS,* 10 F.3d 739, 744 (10th Cir.1993)). That is why the First Circuit has instructed that "blind reliance on a lack of objective findings" alone is inappropriate for determining whether a claimant seeking benefits under the Social Security Act and its regulations is disabled. *Rose,* 34 F.3d at 19.

The fact is that once the ALJ acknowledged that the claimant suffered from chronic fatigue syndrome, he was obliged to accept also that a peculiarity of the disease, according to the *CFIDS Primer,* is that it may not manifest itself on physical examination or in laboratory studies. *See Rose* 34 F.3d at 17, 19.

The ALJ's reliance on the absence of recorded observations of the claimant's appearance of fatigue in the claimant's medical records and his reliance on his own observations at the time of the hearing are likewise misplaced.[13] Unchallenged evidence in the rec-

---

**11.** The acronym "CFIDS" stands for chronic fatigue and immune dysfunction syndrome. It is the term the authors of the *CFIDS Primer* use for chronic fatigue syndrome "because of evidence pointing to immune system abnormalities." *CFIDS Primer,* Record at 319.

**12.** The symptoms referred to in this passage appear repeatedly in the claimant's medical history of record.

**13.** The ALJ may well be mistaken about whether the claimant's medical records contain any re-

corded observation of the appearance of fatigue in the claimant. The December 29, 1993, discharge summary of Women and Infant's Hospital (where the claimant was treated for pelvic-pain and discharge and a gastrointestinal disorder and where she also reported low-grade fever and fatigue) describes the claimant as an "[i]ll appearing female." Record at 150. Whether the ill-appearance of the claimant in December, 1993, was due to fatigue or some other reason is not clear, and the court, for that reason, does not draw any conclusion from the notation. It is mentioned here because it tends to undermine

ord indicates that the fact that the claimant may not have appeared fatigued at the time of any medical examination or that she may not have so appeared and may not have exhibited other symptoms of chronic fatigue syndrome at the time of the hearing before the ALJ are not in themselves significant factors in determining the level of the claimant's disability. Nothing in the record contradicts—and the ALJ did not question—the conclusions of the *CFIDS* Primer that "[i]t is vital to recognize that fluctuations in severity and symptoms within the course of a day and/or weeks are very common. *The patient's outward appearance is not a good indicator of severity as she or he may appear, though not feel, healthy at the time seen.*" Record at 321 (emphasis in original).

Furthermore, no physician who examined the claimant contradicts Dr. Englender's opinion that "[a]lthough on good days [the claimant] is able to sustain activity for 2–3 hours at a time, and can drive a car and attend a meeting intermittently, her ability to do so is unpredictable. It is predictable, however, that if she engages in such activity on one day, she will be unable to do so on the following day." Record at 317. In these circumstances, neither the absence of any recorded observation of the appearance of fatigue in the claimant's medical records nor the observation of the ALJ concerning the claimant's condition on the day of the hearing constitutes substantial evidence to support the ALJ's finding of no disability.

The third foundation of the ALJ's findings is the physical capacity evaluation performed by Dr. Balsam. Dr. Balsam, it will be remembered, did not examine the claimant. Rather, his evaluation of the claimant's physical capacity was based upon a review of the reports and clinical notes of Dr. Englender and the report of Dr. Goldman.

The first thing one notes about Dr. Balsam's review of the claimant's medical history is that he did not review all of it. As just noted, Dr. Balsam looked only at Dr. Englender's notes and reports and the report of the consultative examination performed by Dr. Goldman.[14] Thus, Dr. Balsam did not consult the various reports from as far back as November, 1992 that indicate the claimant's complaints of such things as joint pain and fatigue. Nor did he consult Dr. Allen's July 1993 report in which Dr. Allen said of the claimant that "fatigue was the claimant's most permanent and problematic symptoms [sic]" and that the claimant "simply does not have the energy to do more than basic ADL & to get to her various medical appointments." Record at 214. And, of course, because his evaluation was performed in June of 1994, Dr. Balsam could not have the benefit of Dr. Englender's March 1, 1995 report.

The second thing of note concerning Dr. Balsam's assessment of the claimant's ability to sit, stand and walk; her weight-lifting capacity; and her capacity for work is that this assessment is based entirely upon the absence, in the records Dr. Balsam reviewed, of any history of difficulties in these areas. Record at 279. Of course, the absence of any history of difficulties does not necessarily mean the claimant in fact has the capacities about which Dr. Balsam opined. In any event, Dr. Balsam was simply wrong about the absence of any history of difficulty in the claimant's ability to sit, stand, walk and lift various weights (even in the limited history he reviewed). Dr. Englender's reports comment on several of the claimant's limitations in these areas. *See* pp. 85–86 of this memorandum and order.

"[T]he amount of weight that can properly be given the conclusions of nontestifying, non-examining physicians, 'will vary with the circumstances, including the nature of the illness and the information provided the expert.'" *Rose,* 34 F.3d at 18 (*quoting Berrios*

---

the ALJ's categorical finding that the claimant was "invariably described as alert and in no distress, at least by early 1993." Record at 23.

It is also a matter of some curiosity, in light of the ALJ's reliance on the absence of recorded observations of fatigue in the claimant, that, in his decision, he notes: "Dr. [Prudence] Allen

stated that the claimant *appeared physically debilitated by fatigue ...,* when Dr. Allen saw the claimant on July 9, 1993." Record at 18 (emphasis added).

14. As noted at page 86 of in this memorandum and order, Dr. Goldman did not herself offer an assessment of the plaintiff's physical capacity.

*Lopez v. Secretary of HHS,* 951 F.2d 427, 431 (1st Cir.1991)). The First Circuit in *Rose* suggests that in cases involving chronic fatigue syndrome, the weight to be given a non-testifying, non-examining physician, when compared to contrary evidence given by a treating physician, is to be substantially discounted because "[t]he subjective severity of a claimant's fatigue associated with CFS is not something readily evaluated on an algid administrative record." *Rose,* 34 F.3d at 19.[15]

In this case the value of the opinions of the non-examining physician, Dr. Balsam, is particularly attenuated. Dr. Balsam did not review the entire medical history of the claimant and overlooked important findings and conclusions of the claimant's treating physician. Dr. Balsams opinions, therefore, do not constitute substantial evidence of the degree of the claimant's disability.

## CONCLUSION

Because the evidence on which the ALJ relied is flawed as discussed above, it fails as substantial evidence to support his conclusion that the claimant is not disabled.[16] What remains as the only substantial evidence of the degree of the claimant's disability is the opinion of Dr. Englender (who had treated the claimant for two years by the time of the ALJ's decision) that the claimant satisfies all the diagnostic criteria for chronic fatigue syndrome, and that she is totally disabled from gainful employment.

Pursuant to 42 U.S.C. § 405(g), "[t]he court shall have the power to enter, upon the pleadings and transcripts of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." The court has determined the findings of the ALJ are not supported by substantial evidence. The court now determines that the substantial evidence in the record requires a finding that the claimant is totally disabled from gainful employment. There is no need, therefore, for a further hearing on the subject of the claimant's disability. The amount of retroactive and prospective benefits to which the claimant is entitled, however, cannot be determined on the present record. Accordingly, the case is remanded to the Commissioner for his determination of these matters.

SO ORDERED.

---

**15.** The record also contains the physical capacity evaluation of Dr. Greenberg. That evaluation in turn was confirmed by Dr. Poirier. Dr. Greenberg's evaluation and Dr. Poirier's confirmation suffer the same defect as Dr. Balsam's evaluation: they were made by non-examining, non-testifying physicians. Moreover, it is not clear from the evaluation done by Dr. Greenberg or its confirmation by Dr. Poirier what medical information they had before them when they conducted their evaluations.

The psychiatric evaluation of Dr. Cormier likewise was not based on an actual examination of the claimant, and Dr. Cormier did not testify. In addition, its value can be discounted for the reason that the record does not explain what Dr. Cormier's background is or how he/she reached his/her conclusion.

**16.** The court need not address the testimony of Mr. Testa, the vocational counselor, because, to the extent that that testimony suggested that there were jobs that the plaintiff could perform, it was based upon a hypothetical that assumed that the plaintiff's physical capacity was greater than reliable medical evidence of record demonstrates. See *Rose,* 34 F.3d at 19.