**Not for Publication in West's Federal Reporter**

# United States Court of Appeals

## For the First Circuit

No. 08-2486

RACHEL JOHNSON,

Plaintiff, Appellant,

v.

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

James J. Gannon and Green & Greenberg, on brief for
appellant.
Dulce Donovan, Assistant U.S. Attorney, and Robert Clark
Corrente, U.S. Attorney on brief for appellee.

July 21, 2009

**Per Curiam**.  Claimant Rachel Johnson appeals from the judgment of the Rhode Island district court affirming the denial of her application for Social Security disability benefits.  Claimant alleged disability based primarily on fibromyalgia and a mental condition (depression and anxiety), and, after a hearing, an administrative law judge (ALJ) concluded that although claimant could not return to her past work due to these severe conditions, claimant nonetheless retained the capacity for light to sedentary work which (1) is unskilled, routine, and repetitive, (2) provides an opportunity to alternate between sitting and standing at roughly 30-minute intervals during the day, and (3) involves no overhead work with the left arm and no kneeling, crawling, climbing, or squatting.  In finding that there were jobs that a person with such limitations could perform, the ALJ relied on the testimony of a vocational expert (VE).  While we agree, for essentially the reasons stated in the Report and Recommendation of the magistrate judge, which was adopted by the district judge, that substantial evidence supports the ALJ's conclusion that claimant's mental impairment was not disabling, we conclude that the ALJ's reasoning that claimant's fibromyalgia also was not disabling was flawed and must be reexamined.

We begin with basics.  Fibromyalgia is defined as "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause."  Stedman's Medical Dictionary, at 671 (27th ed. 2000).

-2-

Further, "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities." Harrison's Principles of Internal Medicine, at 2056 (16th ed. 2005). The American College of Rheumatology nonetheless has established diagnostic criteria that include "pain on both sides of the body, both above and below the waist, [and] point tenderness in at least 11 of 18 specified sites." Stedman's Medical Dictionary, supra.

The principal evidence regarding claimant's fibromyalgia for the relevant period -- May 30, 2002 (her onset date) through June 30, 2003 (the expiration of her insured status) -- is contained in the reports of Dr. Yousaf Ali, a rheumatologist who treated claimant. At her first appointment, in September 2002, claimant complained of pain and depression, and a musculoskeletal examination revealed positive, bilateral trapezius trigger points and "exquisite tenderness" in claimant's hips and legs. Trans. at 267-68. However, claimant's motion of her hips, knees, and ankles was normal, and her neurological examination was grossly intact. Id. at 268. Dr. Ali opined that claimant did not appear to meet the criteria for fibromyalgia. Id.

Claimant next saw Dr. Ali in January 2003. Id. at 269. At this time, Dr. Ali noted that claimant was doing "much better"

since she had been getting "local trochanteric bursal injections."[1] Id. Claimant, however, continued to complain of pain in her shoulders, hips, and knees. Id. Dr. Ali noted the presence of multiple tender points and, at this time, made a diagnosis of fibromyalgia. Id.

At claimant's third visit, in April 2003, Dr. Ali described her as having "vague arthralgias and myalgias"[2] and feeling as if her joints were "melting." Id. at 270. Dr. Ali then explained that his diagnosis of fibromyalgia was based on "diffuse joint symptoms above and below the waist in the setting of negative serologies and multiple tender points." Id. He also noted that the treatment for fibromyalgia involves analgesics, physical therapy, aerobic exercise, and a sleep program. Id. at 271.

On July 11, 2003 -- less than two weeks after claimant's insured status expired -- Dr. Ali completed an RFC evaluation form. Id. at 273. Dr. Ali indicated, on this form, that claimant (1) could sit for three hours at a stretch, for a total of four hours during an eight-hour workday, (2) could stand for one hour at a stretch, for a total of one hour per workday, and (3) could walk

---

[1]The trochanter is part of the top of the femur (near the hip), and a bursa is a "sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." Dorland's Illustrated Medical Dictionary, at 1953, 262 (30th ed. 2003).

[2]Arthralgia refers to pain in the joints, and myalgia refers to pain in the muscles. Dorland's Illustrated Medical Dictionary, at 149, 1205.

-4-

for one hour at a stretch, for a total of one hour per workday. Id. Dr. Ali also indicated that claimant could never lift "[u]p to 5 lbs." Id. Since claimant was rated as not being able to sit for six hours or lift 10 pounds, she lacked the capacity for the full range of sedentary work. See SSR 96-9p, Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work, 1996 WL 374185, at *6.

In concluding that claimant could perform light to sedentary work, the ALJ gave "little weight" to Dr. Ali's RFC assessment, and she provided several unpersuasive reasons for this decision. First, the ALJ noted that, during the relevant period, Dr. Ali had seen claimant only three times at roughly three-month intervals. While the length of time that a medical source has been treating an individual is a relevant factor in evaluating the weight to be given to that source's opinions, see 20 C.F.R. § 404.1527(d)(2)(i), the ALJ here offered no explanation for, or citation in support of, her belief that Dr. Ali's treatment relationship with claimant had been too abbreviated to enable him to offer an informed opinion about claimant's physical capabilities. Nor do we think that it is obvious to a lay person such as the ALJ that Dr. Ali had not treated claimant on a sufficient number of occasions over a sufficient amount of time.

The ALJ's second reason for giving little weight to Dr. Ali's RFC assessment was that claimant had shown "considerable

improvement in [her] shoulder complaints after she received trochanteric bursal injections and Ambien for sleep." Trans. at 27 (emphasis added). This is a misreading of the record. The injections that claimant received were in her hips, not her shoulder, and, while Dr. Ali stated that claimant was doing "much better" after the injections, he did not specify in what respect she was better; nor, we add, does it appear that Ambien had anything to do with claimant's improvement. Id. at 269. More significant, however, is the fact that this is the only reference that Dr. Ali made to an improvement in claimant's condition. Indeed, local injections in fibromyalgia patients often provide relief that is only temporary. Harrison's Principles of Internal Medicine, at 2057.

The ALJ next found that Dr. Ali's RFC opinion was inconsistent with his prescription of physical therapy and aerobic exercise. The first problem with this reasoning is that this is the appropriate treatment for fibromyalgia. Second, there is no indication of the level of physical therapy and/or aerobic exercise that Dr. Ali thought would be suitable for claimant, and, according to one source, exercise for fibromyalgia patients "should be of a low-impact type and begun at a low level" with the goal that "[e]ventually, the patient should be exercising 20 to 30 min[utes] 3 to 4 days a week." Id. (emphasis added). Plainly, if this were the level of activity that Dr. Ali had in mind, his recommendation

for physical therapy and aerobic exercise is not inconsistent with his opinion regarding claimant's limited physical abilities.

This leaves what appears to be the ALJ's primary reason for giving little weight to Dr. Ali's limited RFC assessment -- i.e., that such limitations were "of necessity based on the claimant's subjective allegations as the doctor's examinations of the claimant were, with the exception of the presence of tender points, relatively benign." Trans. at 27. Dr. Ali's "need" to rely on claimant's subjective allegations, however, was not the result of some defect in the scope or nature of his examinations nor was it even a shortcoming. Rather, "a patient's report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance on such complaints "hardly undermines his opinion as to [the patient's] functional limitations." Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (internal punctuation and citation omitted). Further, since trigger points are the only "objective" signs of fibromyalgia, the ALJ "effectively [was] requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines," and this, we think, was error. See id. at 106-07 (holding that the ALJ erred in rejecting the RFC opinion of the claimant's treating physician on the ground that, except for the presence of trigger points, there was no "objective" medical evidence to support such opinion).

-7-

As a result of all of the foregoing, the ALJ's reasons for essentially discounting Dr. Ali's RFC opinion are significantly flawed. And, although two non-examining physicians completed RFC assessments opining that claimant had the capacity for sedentary or light work, these assessments provide too cursory a basis upon which to rest a finding that claimant was not disabled. "We have held that the amount of weight that can properly be given the conclusions of non-testifying, non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert." Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) (internal quotation marks and citation omitted).

In relation to the first such assessment, the non-examining physician failed to cite claimant's fibromyalgia as a diagnosis, Trans. at 227, despite the fact that the record contained, at the relevant time, an opinion from an expert (Dr. Ali), that claimant, in fact, suffered from such a condition. We therefore think that this assessment cannot be accorded much weight. The second RFC assessment similarly is flawed because, although the diagnosis of fibromyalgia was acknowledged, id. at 326, it seems as if this assessing physician misunderstood the nature of this condition.

In particular, the physician, in concluding that claimant retained the functional capacity for light work, basically relied on the lack of objective findings to substantiate her condition,

and, as explained supra at 3, such a lack is what can be expected in fibromyalgia cases. Because of this error, the second RFC assessment also is entitled to little weight. See Rose, 34 F.3d at 18-19 (where the non-examining physicians' RFC assessments, in finding that the claimant retained the capacity for at least sedentary work, relied on the lack of objective evidence to account for the claimant's significant level of fatigue associated with his chronic fatigue syndrome (CFS), such assessments could not provide substantial support for the ALJ's conclusion that claimant was not disabled; that is, a lack of objective proof is normal in CFS patients). We add that the latter assessment also suffers from a second shortcoming -- i.e., it appears that the assessing physician ignored Dr. Ali's RFC opinion, see Trans. at 333, although such opinion was in the record by the time of this assessment. See Rose, 34 F.3d at 19 (where a claimant's RFC depends in large part on the functional implications of his or her subjective symptoms, a treating physician's "on-the-spot examination and observation of claimant might ordinarily be thought important") (internal quotation marks and citation omitted). We therefore conclude that the ALJ was not free to disregard Dr. Ali's RFC opinion, and that the hypothetical that was presented to the VE -- being based primarily on the non-examining RFC assessments -- lacked substantial support in the record.

In addition to disregarding Dr. Ali's opinion, the ALJ also decided not to fully credit claimant's allegations of disabling pain, and she based this decision on (1) claimant's supposed dereliction in pursuing treatment and (2) the extent of her daily activities. In regard to the former, the ALJ first noted that claimant had declined recommended injections in her knees. However, this recommendation had been made in May 2001 --about one year prior to the onset date of May 30, 2002, Trans. at 165 -- and thus is not pertinent.

Second, the ALJ cited claimant's failure to pursue physical therapy (PT) that was prescribed in connection with her recovery from surgery on one of her shoulders (which surgery removed a cancerous nodule). Id. at 217-224. The problem, of course, is that this PT was unconnected to claimant's fibromyalgia. Further, the record shows that one of claimant's treating physicians had prescribed PT specifically for the fibromyalgia, and, between April and June of 2003, claimant had attended at least 12 such sessions. Id. at 225-26, 650-54. Plainly, then, "[t]his was not a case in which a claimant failed to seek treatment for symptoms later claimed debilitating." Nguyen v. Chater, 172 F.3d 31, 36 (1st Cir. 1999) (per curiam).

The ALJ's third example of claimant's dereliction in pursuing treatment similarly is flawed. Specifically, although the ALJ is correct that claimant had told one of her physical

-10-

therapists that she had stopped taking Neurontin (a pain medication) because it increased the frequency of her headaches and that she had not informed her doctors of this decision, Trans. at 652, the ALJ's description of this event is not entirely accurate. Specifically, there is <u>no</u> indication, as the ALJ stated, <u>id.</u> at 29, that claimant had discontinued the Neurontin in order to obtain replacement medicine, and, in fact, it appears that, at this time, claimant already was on at least two other pain relievers.[3] <u>Id.</u> at 652, 760, 779. Moreover, the physical therapist specifically had instructed claimant to tell her doctors about discontinuing the Neurontin, and the evidence does not show whether claimant eventually followed this advice.

As for claimant's daily activities, the ALJ relied on the fact that claimant could engage in some of these activities -- <u>e.g.</u>, light housework, meal preparation, and driving short distances. Despite claimant's abilities in this regard, however, we see two problems with this reliance. First, such activities are not necessarily inconsistent with Dr. Ali's opinion that claimant could sit for fours hours per eight-hour day and could walk and stand for one hour each during the same time period. And, while the record shows that claimant probably has the ability to lift

---

[3]Confusingly, the ALJ had stated earlier in the opinion that claimant had taken herself off of the Neurontin <u>without</u> seeking a replacement, <u>id.</u> at 24, and this is a similarly unsupported description of the record.

-11-

some amount of weight, this may not be inconsistent with Dr. Ali's opinion that claimant could never lift "up to" five pounds. That is, it is unclear whether such an opinion means that claimant never could lift items weighing, say, one or two pounds.

Second, once the ALJ accepted the diagnosis of fibromyalgia, she also "had no choice but to conclude that the claimant suffer[ed] from the symptoms usually associated with [such condition], unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms." See Rose, 34 F.3d at 18 (emphasis added). The primary symptom of fibromyalgia, of course, is chronic widespread pain, and the Commissioner points to no instances in which any of claimant's physicians ever discredited her complaints of such pain. Given this, we do not think that the ALJ's decision to discredit claimant was supported by substantial evidence.

For the reasons given above, the judgment of the district court is vacated in part, and the case is remanded to that court with instructions to remand to the Commissioner for further findings and/or proceedings not inconsistent with this opinion.

It is so ordered.