**Richard E. HANCOCK, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

**No. CIV.A. 4:01CV00043.**

United States District Court,
W.D. Virginia,
Danville Division.

June 7, 2002.

Charles Dodson Bennett, Jr., Roanoke, VA, for plaintiff.

Sara Bugbee Winn, Thomas L. Eckert, John F. Corcoran, U.S. Attorney's Office, Roanoke, VA, for defendants.

## MEMORANDUM OPINION

KISER, Senior District Judge.

Before me is the plaintiff's Objection to Magistrate Judge's April 11, 2001 Report

and Recommendation under Fed.R.Civ.P. § 72(a), filed on April 23, 2002.

Plaintiff Richard E. Hancock ("Hancock") appeals the Commissioner of Social Security's final decision awarding Hancock a closed period of disability from September 30, 1994 through November 2, 1995 under the Social Security Act. Hancock disputes the disability termination date.

The plaintiff filed timely objections to U.S. Magistrate's Report and Recommendation, ripening this matter for disposition. For the reasons set forth herein, the plaintiff's objections are **SUSTAINED IN PART** and **OVERRULED IN PART**, the Report and Recommendation is **NOT ADOPTED,** and the Commissioner's decision is **REVERSED** and **REMANDED** to the Administrative Law Judge to reconsider in light of this Court's opinion and to reopen evidence if necessary.

## I. BACKGROUND

*Facts and Procedural History*

Prior to the events from which this action arises, Hancock was a 29–year old high school graduate who worked full-time as a semi-skilled machinist. He performed work the Social Security Act regulations classify as "light" to "heavy," lifting up to 50 pounds occasionally. On September 29, 1994, a tractor trailer collided with the automobile in which Hancock was driving, pushing it into another vehicle head on. As a result, he suffered a severely fractured left hip, right ankle, and jaw; a collapsed lung; and cervical and back sprains. (Record, 97, 106–107, 233–237.) He remained hospitalized either in a hospital or a skilled nursing home for at least 45 days. During this time, orthopedic surgeon and treating physician Lawrence X. Webb operated on his hip and left ankle, placing plates to hold the fragmented pieces together. Another surgeon repaired Hancock's broken jaw and wired his

mouth shut. (R. 106–107.) Following his hospital stay, Hancock underwent physical therapy for almost a year, from November 23, 1994 through October 25, 1995, progressing from wheelchair to walker to crutches to walking without a limp. (R. 138–166, 178–196.)

Since November 1, 1995, Hancock has attempted to return to various jobs including those of machinist, contract machinist, assembler, and even stock boy at Walmart, but cannot perform the required tasks or maintain production quota because he can no longer stoop or squat, and cannot sit or stand for long in the same position without pain, which intensifies throughout the workday. The pain is intense enough to interrupt his concentration. As of November 2, 1995, at least, he also required 2 to 3 sick days per month for recovery time. As a result of the fractures, he has developed posttraumatic arthritis, which his treating physician predicts will worsen.

Hancock applied for Social Security disability benefits on October 31, 1994. He received two paper denials, then a partially favorable decision on July 30, 1996, at which time an administrative law judge (ALJ) awarded a closed period of disability from September 30, 1994, to February 16, 1996. (R. 57–59, 61–65, 69–73, 201–210.) During Hancock's appeal of the latter decision, the Social Security Administration lost a cassette recording of the ALJ's hearing, and so the Appeals Council remanded with instructions to the ALJ to offer Hancock a new hearing. (R. 212–213, 219–220.) The ALJ vacated her earlier decision, and held a new hearing on January 20, 1999, at which she considered evidence *de novo.* (R. 15, 34.)

In her Decision of October 27, 1999, the ALJ found that the "[c]laimant's allegations with respect to his limitations as of November 2, 1995, are fully credible and

entirely supported by medical evidence." (R. 23 (Finding # 10)). This testimony-not all of which the ALJ credited for purposes of deciding the merits—and medical evidence consisted of the following:

- Hancock testified that in November, 1995, while attempting to return to work as a machine operator, he could stand for an hour and a half, at most, before he had to sit down, because he felt pain from his feet all the way through his hips and lower back. On a scale of 1 to 10 (ten being the worst pain he had ever felt in his life), the pain would reach level 6 by the end of the first 1 ½ hours in the morning; at the end of an eight hour day, it would be 9 or 10–"excruciating." (R. 40).
- At level 6 (which he reached by the first hour of the day), the pain encroached on his concentration, particularly when the job required him to pay attention to close tolerances. (R. 40–41).
- Between 1½ hour periods of standing, he would have to rest for an hour to an hour and a half. In order to be able to resume work, the chair in which he rested had to be comfortable, with a back rest and foot rest. He could not sit more than 15 to 20 minutes at a time, because the pins and metal plates in his lower body made him stiffen. He would have to walk around for a few minutes, then stand a little, then sit, etc., until the pain subsided to where he could stand for another 1½ hours. He completed this cycle 3 times during the course of a day. The lowest level to which the pain ever subsided while sitting was 6 or 7, which still encroached on his concentration. (R. 42–43).
- For the period of 7/18/95 to 8/14/95, at least, Hancock had a diagnosis of CR

723.4 (cervical radiculitis) [1] and CS 739.1 (cervical segmental dysfunction-thoracic region). (R. 171 (Exhibit 25)). This was in addition to the mending bones.

- There are approximately 30 pages of physical therapy and rehabilitation notes for this period. A Martinsville Hospital physical rehabilitation progress report dated October 31, 1995, reported that Cybex testing showed a 15% deficit in shoulder flexors, 26% deficit in shoulder extensors, 16% deficit in hamstrings, and 9% deficit in quadriceps. Physical therapists' notes say that as of September 28, 1995, "[Hancock] was unable to squat deep enough to pick up a wooden box on the floor" but as of October 26, 1995, "Pt. was better in ability to squat freely but still compromised in picking heavy (20 lb.) object from floor." The PT's recommendation was to continue physical therapy. (R. 179).
- Dr. Webb's office notes for August 8, 1995 report a diagnosis of "cervical sprain syndrome" in addition to the mending broken bones, but otherwise report only "occasional soreness in the left hip, particularly with activity, squatting, and changing weather," and "some restriction of the forward flexion of the cervical spine on testing." Webb's September 21, 1995 notes report no progress on the cervical strain, with a 60% range of movement, tenderness and soreness in the upper and lower extremities. "He [Hancock] has told me he has been attempting to do some exercises at night, but still poor toleration for being up for prolonged periods, i.e., beyond two hours. . . . Currently in my opinion he is unable to return to work." (R. 193).

---

**1.** "Inflammation of the root of a spinal nerve as it emerges from the spinal cord." J.E. Schmidt, ed., *Attorney's Dictionary of Medicine* (Bender 2001), p. R–10.

• Dr. Webb's November 2, 1995 office notes report "doing well...mobilizing satisfactorily without a limp in the office," good motion of ankle and hip, and progress in PT. "He may in my opinion return to work, he works as a machinist." (R. 197).

The same evidentiary sources report the following for the period following November 2, 1995:

• Hancock attempted to return to work as a machine operator at Whorley Machines on November 12, 1995. He had to load small parts on a machine onto which he had to climb. (R. 43). He missed 2 to 3 days per month due to pain, during which he was worn out, sore, and tired. At the end of each workday, his wife would have to massage his legs and apply ice or heat to alleviate pain. He took "a lot" of Tylenol, Advil, and a prescription pain killer. Eventually his employer asked him to resign because he could not keep up with production quotas. He couldn't concentrate, and also had difficulty climbing up and down onto the machine. R.44–45. He would eventually quit on May 17, 1996. (R. 259). By this time, Hancock was taking 800–1600 mg. of Motrin per day, plus one dose of Propox–N, a prescription pain reliever with a sleep aid. He also took Tylenol PM as needed for more intense pain at night. (R. 170).

• Dr. Webb's February 9, 1996 office notes state: "Overall doing satisfactorily. He notes an aching pain in both knees and ankles as the day wears on." The doctor dispensed two sample nonsteroidals to see if they help more than Motrin. Webb saw in X-rays "some marginal osteophyte formation of the femoral head." He warned Hancock "about arthritic changes." (R. 198).

• Describing the period May, 1996 to July, 1997, Hancock testified that he could stand "a little bit longer" during this period compared to 1994–1995 because of the intervening year of physical therapy, which included strength rehabilitation. He could now stand up to two hours at a time. Between period s of standing, he still had to sit down or lay down. The sitting consisted of the same cycle as previously described-sitting for fifteen or twenty minutes, then walking around, sitting, etc. After a two hour period of standing, his pain would be at level 8 or 9. The pain still affected his concentration. He took six to ten over-the-counter analgesics a day.

• Dr. Webb's notes for November 15, 1996, state: "He has [X-ray] findings consistent with some early posttraumatic arthritis which would account for his symptomology." (R. 240 (Exhibit 38, p. 9).)

• Webb's notes for May 5, 1997 recognize that "with the possibility for arthritic sequelae later," Hancock's plan to train himself to be a contract engineer "makes perfect sense. I do not think he is capable of returning to his job as machinist." Webb also reports: "He notes that with prolonged sitting he gets a numb sensation overlying the right groin area and proximal thigh anteriorly. This is alleviated by standing and walking." (R. 241).

• Between July, 1997 and September 20, 1997, Hancock attempted to work as a stock person stocking shelves at Walmart. He could not kneel and found "the most painful position" to be stooping, both things he had to do in order to stock shelves. (R. 46).

The ALJ also heard evidence from a Vocational Expert (VE), whom the ALJ asked the following hypothetical:

If you had a person in the late twenties with a better than high school education. A work background such as depicted in

this record, and if that person needed to be able to avoid stooping and bending. And needed to be able to sit down approximately every hour. Would there be jobs at the light or sedentary levels-? (R. 51). In his response, the VE noted that the hypothetical worker in the question falls into the "sedentary" category, that there 3000 cashier jobs and 1500 assembler positions in Virginia which are classified as sedentary unskilled jobs, and that the stooping or bending limitation "shouldn't erode that occupational base very much, if any." (R. 51–52).

On cross-examination, Hancock's attorney attempted to tailor the hypothetical:

Q. If you add to the hypothetical his testimony about being able to sit. He said sitting makes it worse, you know, the pain builds up in twenty to thirty minutes at that. And then having to stand up and walk around, and do that combination of things for an hour.

A. The walking is what alters the occupational base. I think the labor market can accommodate that at stand, but not walking around.

Q. Okay.

A. Because it takes you away from where you're supposed to be.

Q. And especially these jobs being station jobs, right?

A. Yeah, yeah, and when you deal with unskilled jobs that sort of comes with the territory. I mean you're supposed to be doing something when you work.

(R.52–53_). Hancock's counsel also asked about the need to take absences:

Q. . . . . . [I]f he missed three days a month what effect would that have had in terms of-

A. Either separately or cumulatively a loss of occupational base.

Q. Okay.

A. As you know I have done a lifelong survey on that subject and found that the actual tolerable rate of absenteeism is about ten percent roughly on an annual basis, which is two days per month. . . .And that's the maximum. (R.53–54).

The VE also stated that "[i]f the deficits [in attention and concentration caused by pain] lead to an excessive error rate in the performance of even unskilled jobs then it could erode the occupational base" even further. (R. 54).

As previously stated, the ALJ found Hancock's testimony "fully credible" and supported by objective medical evidence. She also found credible the records and opinion of Hancock's treating physician. There is no indication in her Decision that she made any choice between contradictory evidence. At the heart of Hancock's appeal, however, is the ALJ's refusal to credit any testimony by Hancock concerning the physical difficulties he encountered when he tried to return to work in November, 1995, or the amount of sick days he took, both of which otherwise would be relevant. Citing federal regulations and a North Carolina district court opinion which state that the SSA cannot use an applicant's return to a period of trial work as evidence that the applicant is no longer disabled, the ALJ ruled that she could not weigh *any* evidence of work-related pain or absenteeism, even if the applicant himself wanted to offer it. (R. 19–21). Her finding that Hancock's disability terminated on November 2, 1995 was based almost entirely upon a 4–page summary of office visits prepared by Dr. Webb, which states in the entry dated November 2, 1995 that "[Hancock] may in my opinion return to work, he works as a machinist"-as well as the vocational examiner ("VE")'s responses to her hypothetical questions. On the basis of these, the ALJ concluded that "the

claimant's impairments and/or combinations of impairments remained severe" and that he cannot return to his prior work as machinist. She also concluded:

> As of November 2, 1995, claimant had the residual functional capacity to perform no more than a very narrow range of light exertion, which required that he be permitted to sit after a sustained hour of standing. His capacity at that level is further reduced by inability to stop or kneel. (20 C.F.R. 404.1567)

> . . . . .

> Section 404.156 of regulations No. 4 and section 416.969 of regulations No. 16 and Rule 202.28, Table No. 2 of Appendix 2, Subpart P, Regulations Np. 4, direct that the claimant, considering residual functional capacity, age, education, and work experience, be found "not disabled."

> Although the claimant's additional non-exertional limitations do not allow him to perform the full range of light work, using the above-cited rule as a framework for decision-making, there are a significant number of jobs in the national economy which he could perform. Examples of such jobs are: cashier (3,000 in Virginia), and assembler (1,500).

> The claimant's disability ended in November 1995, the month the he demonstrated the ability to engage in substantial gainful activity. (20 C.F.R. 404.1520(a), 404.1505 and 404.1511).

(R. 23–24 (Findings 11, 15, 16, and 17)).

On June 6, 2001, the SSA Appeals Council denied review of the ALJ's decision.

Hancock filed a Complaint in this Court on August 1, 2001, and consented to the magistrate's handling of the case. In his Report and Recommendations of April 11, 2002 ("R & R"), the magistrate judge stated in closing dicta that he "likely would have resolved the case a different way had [his court] been the administrative arbiter," but held that the final decision of the Commissioner had evidentiary support and was not inconsistent with the Commissioner's regulations, and he recommended that I affirm the Commissioner's decision. R & R, 5.

On appeal and in his Objections, Hancock argues: (1) the ALJ oversimplified or simply failed to weigh evidence concerning Hancock's inability to sit in any one position for any extended length of time, much less the eight hours required in order to do "sedentary" or "light" work; (2) the ALJ's finding that Hancock would need an employment-precluding number of absences only from machinist's work-and not from a less demanding job—is not supported by the evidence; (3) the ALJ failed to heed SSA policy rulings to the effect that "[a] complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply,"[2] (4) the ALJ was barred by *res judicata* and collateral estoppel from changing the closing date she had found in her prior decision (February 14, 1996) to an even earlier date; and (5) the magistrate deprived Hancock of due process by issuing the R & R without briefing by the plaintiff.[3]

---

2. "Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work–Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work," SSR 96–9p, 1996 WL 374185, * 8 (S.S.A. July 2, 1996).

3. I overrule plaintiff's estoppel and due process objections summarily, finding no merit in them. The ALJ's prior decision has no preclusive effect, as it was vacated and a new hearing conducted *de novo*. Five-and-a-half months passed between the time the Commissioner filed her answer and summary

## II STANDARD OF REVIEW

 A reviewing district court will not disturb the Commissioner's findings of fact if those findings are supported by substantial evidence. *See* 42 U.S.C. § 405(g). The Fourth Circuit defines "substantial evidence" as:

evidence which a reasoning mind would · accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence. It is the duty of the ALJ evaluating the case, not the federal courts, to make findings of fact and to resolve all evidentiary conflicts.

*Kasey v. Sullivan*, 3 F.3d 75 (4th Cir. 1993), (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990)) (*quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.1966) (quotations omitted)). The Fourth Circuit has also stated that:

We cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. *See, e.g., Myers v. Califano*, 611 F.2d 980, 983 (4th Cir.1980); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir.1977). As we said in *Arnold*: "The courts ... face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence." Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Gordon v. Schweiker*, 725 F.2d 231, 235–236 (4th Cir.1984) (*quoting Arnold*, 567 F.2d at 259). Under substantial evidence review, then, the entire record must be reviewed to ascertain if a decision was supported by substantial evidence. A district court will nor disturb an ALJ's credibility determinations or revisit the ALJ's resolution of conflicting evidence. However, if the ALJ appears, without stating a reason, to have credited some probative evidence over other evidence or to have ignored evidence altogether, a remand or reversal may be necessary.

 A reviewing court will also review for the application of improper or incorrect legal standards. Even if substantial evidence supports the Commissioner's factual findings in support of a benefit denial, a district court may reverse if the ALJ committed errors of law. *See* Harvey L. McCormick, *Social Security Claims and Procedures*, 5th ed., ¶ 14:14 (West 1998, p. part 2001) (numerous citations omitted). In addition, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir.1987) (ALJ misapplied or ignored the "attending physician's rule" in effect at the time when the judge stated that she would credit the attending physician's conclusory statement of total disability only "to the extent to which it is supported by specific and completed clinical findings and other evidence").[4]

---

judgment motion and the time the magistrate entered his Report and Recommendations, giving Hancock ample notice and opportunity to be heard in that forum.

4. The standard for weighing treating physicians' opinions is now set forth at 20 C.F.R. § 404.1527.

## III DISCUSSION

The ALJ's analysis is not disputed through the first four of the standard five steps of her disability determination. *See* (R. 1–4 (following 20 C.F.R. § 404.1520)). The fifth step requires a determination of whether the claimant has "residual functional capacity (RFC) for any other substantial gainful activity." 20 C.F.R. § 404.1520(f). "RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96–9P, 1996 WL 374185, *2. In finding that Hancock had sufficient RFC as of November 2, 1995, the ALJ cited the following:

- "great strides" attained in Hancock's physical therapy. (R. 18 (*citing* Exhibits 21 through 26 (R. 138–196)), though citing no particular level of attainment);
- Dr. Webb's release of Hancock to work as a machinist on that date, even after Hancock reported to him that he could not stand longer than two hours, remarking that such pain was controlled with Advil. (R. 21 (paraphrasing R. 199));
- Webb's follow up report that Hancock was, in the ALJ's words, "doing well" on February 9, 1996 (R. 200), and that pain due to prolonged standing "was nonetheless controlled with over the counter Motrin." (R. 18 (paraphrasing record at R. 201));
- a characterization of Hancock's impairment as "an inability to stoop or bend, and [a need] to sit down often, at least every hour." R. 22–23;
- the VE's answer to the ALJ's hypothetical, which the ALJ characterized as showing that sedentary work not requiring stooping exists in significant numbers. R. 22–23.

### A. The ALJ's partial exclusion of plaintiff's testimony was premised upon an error of law.

In describing Hancock's sit-stand limitation as "a need to sit down often, at least every hour," and not something more qualified, the ALJ must have disregarded a good deal of Hancock's testimony concerning his difficulty after returning to work in November, 1995. Concerning Hancock's testimony of the pain and discomfort he suffered after trying to return to work-particularly the lack of difference sitting down made to his pain and inability to concentrate-the ALJ wrote: "I do not consider the claimant's inability to make accommodations to this specific job or to [sic] his absences. To do otherwise would be in contravention of the trial work period regulations." (R. 26). At another place in her decision, she wrote: "Counsel requests that I consider claimant's work as a trial work period. Yet, in the hearing, he erroneously submitted argument *about the work itself* to counter my conclusions that the claimant became ineligible for trial work period as of November, 1995." (R. 19). "I will not consider claimant's inability to perform as a stocker or a machinist either in the positive or negative light." (R. 21).

The ALJ arrived at this ruling through the following logic: Hancock's counsel has argued all along that the mere fact that Hancock returned to work that month should not be counted against him. Under the regulations, a "trial work period" is one in which a claimant may test his ability to work and still be considered disabled. It begins and ends as described in 20 C.F.R. § 404.1592(e). During this period, a claimant may perform work in as many of nine months, which do not have to be consecutive, before the *fact of work itself* shows disability has ended. If a claimant has worked for nine months, the beginning

of the trial work period may be considered the end of the disability.

The trial work period (and, in effect, the period of disability) may end before the nine months have terminated, if "new evidence, other than evidence relating to any work you did during the trial period, shows you are not disabled." 20 C.F.R. § 404.1592(e)(3). In *Love v. Heckler*, 564 F.Supp. 195, 198 (W.D.N.C.1983), cited by the ALJ, the district court held that before an ALJ can consider a claimant's disability to have ended during a trial work period, there must be "demonstrable residuals evident from the medical evidence on record, additional consultative physical capacity evaluations, and the Plaintiff's own testimony" showing that the plaintiff has sufficient RFC to work. "A vocational expert should then have been questioned regarding what jobs, if any, existing in significant numbers in the national economy," the claimant is capable of working. *Id.* In *Love*, the ALJ had made numerous legal errors with regard to the use of evidence of employment during a trial work period. *Id.* Citing *Love*, the ALJ held that she could not consider any job-related evidence from Hancock's trial work period in determining whether his disability terminated on a particular date during that period.

That conclusion was in error. Obviously, 20 C.F.R. § 404.1592(e) limits the use of evidence *of work itself* to warrant termination of a disability period. The rule prevents the claimant from being punished for taking the initiative of trying to return to work. Like the subsequent remedial measures rule in torts, the rule furthers public policy by encouraging attempts to return to work, but limiting the conditions under which the Commissioner may use those attempts against the claimant. The regulation states that if the Commissioner is going to terminate the claimant's disability during a trial work period, it must be on the basis of new medical evidence or testimony, not the trial work itself. Here, the ALJ followed the rule with respect to Commissioner's case, but she also extended the rule to exclude the claimant's evidence as well. Neither 20 C.F.R. § 404.1592(e) nor *Love* preclude such evidence when offered by a *claimant*, however. Furthermore, the policy behind 20 C.F.R. § 404.1592(e) does not warrant such an extension of the rule. Indeed, the ALJ's extension of the rule is arguably an impermissible restriction on the evidence explicitly permitted under the rule, namely, "the plaintiff's own testimony." *Love*, 564 F.Supp. at 198. The magistrate's R & R fails to recognize that it was a mistake of law for the ALJ to exclude this evidence.

*B. The ALJ made an error of law in premising her finding of RFC upon an improperly unqualified hypothetical question to, and answer from, the vocational expert.*

Whether or not the ALJ misapplied 20 C.F.R. § 404.1592(e) and *Love* in excluding much of Hancock's testimony, the ALJ did note that "in November 1995, claimant was not able to sit or stand on a sustained basis exceeding one and a half hours without changing positions." (R. 21). However, she did not put this in her formal findings, and in her hypothetical to the VE, she described Hancock as a person merely "who needs to sit down often, at least every hour." (R. 16). As a paraphrase of the evidence, this ignores Hancock's testimony in a number of prejudicial ways. According to his testimony, Hancock would have to sit for an hour to an hour and a half between standing periods. In order to be able to resume work, the chair had to be comfortable, with a footrest. He could not sit more than 15 to 20 minutes at a time, because the pins and

metal plates in his lower body made him stiffen. He would have to walk around for a few minutes, then stand a little, then sit, etc., until the pain subsided to where he could stand another 1½ hours. He completed this cycle 3 times in the course of a day. The lowest level to which the pain ever subsided while sitting was 6 or 7, which still encroached on his concentration. (R. 42–43.) By the 3rd such cycle, the pain was at a level 9 or 10. (R. 41.)

■ When the ALJ glossed over the difficulties Hancock had sitting or remaining in any one position, she failed to credit Hancock's "fully credible" testimony in a fatal way. Her hypothetical to the VE asked only whether there are jobs for people who cannot stand, stoop, or kneel. This was a mischaracterization of Hancock's testimony, and to use the VE's unqualified answer as a finding of fact was to commit an error of law. "[T]he administrative law judge's hypothetical question to a vocational expert must mention significant functional limitations." *Young v. Appel,* 1999 WL 33117094 (D.Me.1999) (unpublished) (ALJ's finding that claimant had RFC to work as motel desk clerk, hand assembler, electronics assembler, or cashier would have been unsupported where hypothetical failed to include mention that claimant's left hand was fused at the wrist and that he could not bend from the waist) (citing *Rose v. Shalala,* 34 F.3d 13, 19 (1st Cir.1994)). *See also Coughlin v. Secretary, HHS,* 671 F.Supp. 138, 142 (E.D.N.Y.1987) (failure to make finding concerning left wrist fusion was error where ALJ concluded claimant could perform sedentary assembly work). The VE answered the hypothetical as posed, saying cashiers and assemblers don't necessarily have to stand, stoop, or kneel. The ALJ then used the availability of such jobs in concluding that such work existed for Hancock in significant numbers. She failed, however, to credit the VE's qualification to his answer, in which he stated that the claimant's need to move around constantly "alters the occupational base." (R. 53). "[T]he labor market can accommodate that at stand, but not walking around.... [Y]ou're supposed to be doing something when you work." *Id.*

The record contains evidence of other erosions of the occupational base which the ALJ failed to consider. The VE testified that the inability to maintain attention and concentration because of pain could lead to an excessive error rate which would further erode the occupational base of even these unskilled jobs. (R. 54.) He also testified that two days of absenteeism per month was "the maximum" that an employer of unskilled sedentary labor could tolerate. None of these functional limitations or occupational base erosions are counted in the ALJ's conclusions or discussed in her decision. This, too, was an error of law, assuming the full credibility and medical support of Hancock's testimony. *See Young,* 1999 WL 33117094 at * 3 (ALJ's failure to discuss the effect of pain as diminishing concentration is error where there is objective medical evidence for the claimant's pain testimony) (citing *Avery v. Secretary, HHS,* 797 F.2d 19, 21 (1st Cir.1986)); *see also,* SSR 96–9p, 1996 WL 374185, *5 (pain itself, depending upon its manifestation and severity, can be an exertional or an non-exertional limitation).

At the very least, the ALJ should have determined the erosion of occupational base due to Hancock's specific limitation before making a final ruling. The VE's attempts to qualify his answer to the hypothetical show that his initial answer should not have been used at face value.[5] At

5. The ALJ was selective in her use of the VE's testimony. Although the VE twice corrected

most, the particular limitations ignored by the ALJ may disqualify Hancock from even "sedentary" work. The policy guidance cited by the ALJ in her decision states the following about such work:

Sedentary Work

The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8–hour workday. *Sitting would generally total about 6 hours of an 8– hour workday.* Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.

. . . . .

Standing and walking: The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8–hour workday. If an individual can stand and walk for a total of slightly less than 2 hours per 8–hour workday, this,

by itself, would not cause the occupational base to be significantly eroded. Conversely, a limitation to standing and walking for a total of only a few minutes during the workday would erode the unskilled sedentary occupational base significantly. For individuals able to stand and walk in between the slightly less than 2 hours and only a few minutes, it may be appropriate to consult a vocational resource.

*Sitting: In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8–hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2–hour intervals. If an individual is unable to sit for a total of 6 hours in an 8–hour work day, the unskilled sedentary occupational base will be eroded. The extent of the limitation should be considered in determining whether the individual has the ability to make an adjustment to other work.* See Alternate sitting and standing below.

The fact that an individual cannot do the sitting required to perform the full range of sedentary work does not necessarily mean that he or she cannot perform other work at a higher exertional level. In unusual cases, some individuals will be able to stand and walk longer than they are able to sit. If an individual is able to stand and walk for approximately 6 hours in an 8–hour workday

---

the ALJ in noting that her hypothetical allowed, at best, "sedentary" work, the ALJ found that Hancock was capable of performing "light" work. "Light" work is a more difficult category of work requiring the ability to do "substantially all of these activities" of lifting weight to 20 pounds, carrying weights to ten pounds, walking, and sitting. "Sedentary" work requires walking and standing "occasionally," meaning "from very little to

up to one-third of the time." 20 C.F.R. § 404.1568; "Titles II and XVI: Determining Capability to Do Other Work–The Medical–Vocational Rules of Appendix 2," Social Security Ruling ("SSR") 83–10, 1983 WL 31251, * 5 (S.S.A.1983). "The primary difference between sedentary and most light jobs" is that a job is in the "light" category "when it requires a good deal of walking or standing." SSR 83–10, *5.

(and meets the other requirements for light work), there may be a significant number of light jobs in the national economy that he or she can do even if there are not a significant number of sedentary jobs.

*Alternate sitting and standing:* An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. *Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.* It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work....

*An ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply,* but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work.

SSR 96–9A, * *3, 5–6, 8 (emphases added).

■ The guidance discusses many conditions clearly at play in this case (particularly, "the need to alternate sitting and standing," and the inability to sit for 6 out of eight hours of the workday) which would either erode the occupational base or disable Hancock from most sedentary positions. Indeed, if the ALJ credited fully Hancock's testimony that he could not stoop, she should have found-according to the SSR-that Hancock was disabled, absent "unusual" evidence to the contrary. The SSR requires an ALJ in this circumstance to make detailed RFC findings in order for a VE to be able to determine which, if any, sedentary jobs a claimant may take. But the ALJ's factual findings are cursory and inaccurate; they appear to be contrary to testimony she acknowledged was "fully credible" and supported by objective medical evidence. Furthermore, her hypothetical did not include all of Hancock's actual limitations; she did not allow the VE to determine for the record just how far Hancock's actual condition eroded the sedentary occupational base; and contrary to the VE's testimony, she found Hancock capable of performing a limited range of "light" jobs. In each of these rulings, the ALJ either ignored or mischaracterized testimony, or committed an error of law in analyzing the facts as she understood them. Accordingly, I cannot agree with the magistrate when he states that "no evidence that all the jobs [the VE] identified would be eliminated" supports the ALJ's neglect to take erosion of the occupational base into account. R & R, 5. The regulations and case law require her to take it into account, and failure to determine its extent prior to finding sufficient RFC was error of law.

C. *The ALJ either ignored credible evidence presented by the treating physician, or failed to resolve conflict between plaintiff's testimony and treating physician's evidence.*

If a treating physician's opinion contradicts a claimant's own testimony, an ALJ would certainly have discretion, under the substantial evidence rule, to believe the

doctor over the patient. That is not what happened in this case, however. Rather, the ALJ claims to have given "great weight" to both Hancock's testimony and Dr. Webb's medical notes. (R. 22). If both of these sources are accorded full credibility and great weight, however, they are either unreconcilable, or must weigh in favor of a finding of disability.

On November 2, 1995, Dr. Webb thought Hancock might return to work as a machinist. (R. 199). This opinion, isolated from other evidence, could be "substantial evidence" of non-disability. However, the record also reflects the fact that Hancock tried to return to machinist's or similar work, but couldn't tolerate it. Furthermore, the record shows that *Dr. Webb later reversed his opinion. See* R. 238 (Webb's office notes of July 11, 1996, stating: "He will need to remain out of work as far as his machinist job is concerned"). The ALJ was correct in stating that both of these opinions referred only to prospective work as a machinist, a job the ALJ would rule was beyond Hancock's capability. If that is the case, however, then neither opinion is relevant to determining whether Hancock could perform "light" or "sedentary" work as of November 2, 1995. Furthermore, the ALJ's decision cannot stand without the withdrawn opinion, because there is no other medical evidence showing Hancock had sufficient RFC as of November 2, 1995. No other statement in Webb's November 2, 1995 notes, or in the physical therapy records, says anything about Hancock's ability to tolerate sitting or standing, or the extent of his pain and its affect on his ability to concentrate. At most, they only discuss mobility. Without Webb's withdrawn opinion, there is no substantial evidence in the notes from that date to support a factual finding that Hancock's disability had improved sufficient for him to work for eight hours in a job which exists in substantial numbers in the economy. Accordingly, I cannot agree with the magistrate that the ALJ's decision was supported by substantial evidence.

## IV CONCLUSION

The ALJ committed a error of law in reading 20 C.F.R. § 404.1592(e) to exclude Hancock's testimony concerning his pain and difficulty maintaining position and concentration while attempting to work in November, 1995. She also committed an error of law when she did not include in her hypothetical to the VE the claimant's inability to sit for 1½ hours without changing positions or walking around; in failing to determine the extent to which Hancock's unrebutted testimony of inability to sit, need to walk around, and concentration-killing pain, eroded the occupational base of jobs which Hancock could perform; and in failing to determine how far the occupational base was eroded by Hancock's complete inability to stoop, before ruling that Hancock could perform the sedentary work described by the VE. I must also disagree with the magistrate and find that the ALJ had no substantial basis for concluding that Hancock could perform a range of "sedentary" work, where the record shows that he could not sit for 6 hours during a work day, the record is incomplete concerning the workplace's ability to let him walk around often as an accommodation, and the medical opinion upon which the ALJ relied was a either contradicted by the declarant himself or else is irrelevant to determining RFC for sedentary work. For these reasons, I **SUSTAIN** the plaintiff's objections to the magistrate's R & R concerning the merits of the ALJ's decision. I **OVERRULE** the plaintiff's collateral estoppel, *res judicata*, and due process objections. The Report and Recommendation is **NOT ADOPTED**, and the Commissioner's decision is **REVERSED** and **REMANDED** to the Administrative

Law Judge to reconsider in light of this Court's opinion and to reopen evidence if necessary.

An appropriate order shall issue.

### *ORDER*

Before me is the plaintiff's Objection to Magistrate Judge's April 11, 2001 Report and Recommendation under Fed.R.Civ.P. § 72(a), filed on April 23, 2002.

The plaintiff filed timely objections to U.S. Magistrate's Report and Recommendation, ripening this matter for disposition. For the reasons set forth herein, the plaintiff's objections are **SUSTAINED IN PART** and **OVERRULED IN PART,** the Report and Recommendation is **NOT ADOPTED,** and the Commissioner's decision is **REVERSED** and **REMANDED** to the Administrative Law Judge to reconsider in light of this Court's opinion and to reopen evidence if necessary.

The Clerk is directed to send a certified copy of this Order to United States Magistrate B. Waugh Crigler, Administrative Law Judge Martha J. Lamphear, and all counsel of record.