2010 DNH 161

Melissa R. SIMMONS

v.

**Michael J. ASTRUE, Commissioner, Social Security Administration.**

**Case No. 09–CV–378–PB.**

United States District Court, D. New Hampshire.

Sept. 8, 2010.

John A. Wolkowski, Backus Meyer & Branch LLP, Manchester, NH, for Plaintiff.

T. David Plourde, U.S. Attorney's Office, Concord, NH, for Defendant.

## MEMORANDUM AND ORDER

PAUL BARBADORO, District Judge.

Melissa Simmons appeals from the Social Security Commissioner's denial of her application for Disability benefits. She faults the Administrative Law Judge ("ALJ") who denied her claims both for failing to find that she met the requirements of the listing for multiple sclerosis and for refusing to seek testimony from a vocational rehabilitation expert before determining that a significant number of jobs existed in the national economy that Simmons could perform in spite of her multiple sclerosis. For the reasons set forth below, I affirm the Commissioner's decision.

## I.  BACKGROUND [1]

### A.  Procedural History

Simmons applied for DIB on November 23, 2007 claiming disability caused by the symptoms of her multiple sclerosis. (Tr. at 43, 91–93). After Simmons' initial application was denied by the Commissioner, Simmons sought an administrative hearing. (Tr. at 47–50, 51–55). At the hearing, Simmons was represented by counsel and both she and her husband testified. (Tr. at 20–42).

On June 3, 2009 the ALJ denied Simmons' claim. (Tr. at 12–19). While the ALJ found that Simmons' multiple sclerosis constituted a severe impairment, she determined that it did not meet or equal the criteria for multiple sclerosis identified in Section 11.09 of the Commissioner's Listing of Impairments("the Listing"). 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09; (Tr. at 15). In addition, the ALJ found that while Simmons was unable to perform her past relevant work, she nevertheless retained the residual functional capacity ("RFC") to perform work that existed in significant numbers in the national economy. (Tr. at 15–17).

---

1. The background facts are presented in detail in the parties' Joint Statement of Material Facts (Doc. No. 13) and are summarized here.

Citations to the Administrative Record Transcript are indicated by "Tr."

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Simmons' request for review on September 11, 2009. *See* 20 C.F.R. §§ 404.905, 404.987(a).

## B. *Education and Work History*

Simmons was 42 years old when the ALJ denied her application on June 3, 2009. (Tr. at 12–19). She has a college education, and her past relevant work includes time spent as an executive assistant, a teacher's aid and an office manager. (Tr. at 29, 113–114). Most recently, Simmons has worked from home as a telemarketer for approximately five hours a week. (Tr. at 26, 97–99).

## C. *Medical Evidence*

During the spring of 2006, Simmons reported numerous instances of back pain as well as tingling or numbness in her lower extremities. (Tr. at 206, 216–18, 226, 242–43). After multiple visits to the hospital and several different physicians, an MRI scan of Simmons' dorsal spine revealed a small enhancing intramedullary[2] lesion at the T3 level. (Tr. at 256–58). The potential diagnosis was that of a demyelinating disorder[3] including multiple sclerosis. (Tr. at 256).

After her MRI, Simmons saw Dr. George Neal, a neurologist. (Tr. at 294–95). Dr. Neal noted his suspicion that the abnormality noted on the MRI may indicate multiple sclerosis, but he did not believe it met the conventional diagnostic criteria at that point. (Tr. at 294). Therefore, Dr. Neal elected to defer treatment. (Tr. at 286).

Over the next few months Simmons attended several followup appointments with Dr. Neal. (Tr. at 284, 286). Dr. Neal's evaluations noted normal strength in Simmons' legs and no sign of visual neuropathy[4]. (Tr. at 255, 286). Simmons' motor bulk, tone and strength, muscle and plantar reflexes, gait, and station were all normal. (Tr. at 284). A repeat MRI scan of Simmons' spine on June 29, 2006 revealed the same lesion at T3 noted on the March 30 scan. (Tr. at 253). The lesion was stable, and no new lesions were noted. (Tr. at 253).

On August 10,2006, in an exam with Dr. Neal, Simmons reported that her symptoms were mostly gone. (Tr. at 281). Dr. Neal surmised that Simmons likely had a demyelinating event, the symptoms of which were mostly resolved. (Tr. at 281).

Three months later, Simmons visited Dr. Neal complaining of reduced energy levels, episodes of numbness, as well as instances of crying and constipation. (Tr. at 280). On exam, Dr. Neal noted that Simmons was awake and alert, showing no signs of impairment in cognitive function. (Tr. at 280). Simmons' motor bulk, tone and strength, muscle and plantar reflexes, gait, station, and sensory exam were all normal. (Tr. at 280). Dr. Neal suggested further MRI scans of the brain and spine. (Tr. at 280).

On November 30, 2006, Simmons attended an exam with Dr. Maria Houtchens at the Partners Multiple Sclerosis Center. (Tr. at 207–208). On exam, Dr. Houtchens noted that Simmons was alert and orient-

---

**2.** Intramedullary, refers to an area within the spinal cord. *See Stedman's Medical Dictionary* 917 (27th ed. 2000).

**3.** Demyelination, refers to the loss of myelin with preservation of the axons or fiber tracts. Central demyelination occurs within the central nervous system and is seen with multiple sclerosis. *See Stedman's* at 472.

**4.** Neuropathy is a classical term for any disorder affecting any segment of the nervous system. *See Stedman's* at 1211.

ed. (Tr. at 208). Her memory, comprehension, repetition, and naming were intact. (Tr. at 208). Motor examination showed 5/5 muscle strength in muscle groups with normal muscle tone and bulk. (Tr. at 208).

Dr. Houtchens opined that Simmons satisfied a diagnosis of clinically isolated syndrome [5] on the basis of a myelitis episode. (Tr. at 208). She was not convinced that the later weakness and fatigue Simmons experienced was a relapse, but noted that it was possible if additional lesions were noted on a follow-up MRI. (Tr. at 208). In addition, Dr. Houtchens was not certain Simmons had clinically definite multiple sclerosis at that point, but she determined that Simmons was a candidate for therapy due to the delayed conversion to clinically definite multiple sclerosis by patients who started treatments early. (Tr. at 208).

On December 23, 2006, Simmons underwent another MRI scan. (Tr. at 250–52). The scan revealed the same intramedullary lesion on the cervical cord at the T3 level. (Tr. at 250). The lesion appeared unchanged from the July and March examinations. (Tr. at 250). No additional abnormalities were noted. (Tr. at 250–51). An MRI of Simmons brain appeared normal. (Tr. at 252).

On February 2, 2007 Simmons saw her primary care physician, Dr. Rosenbaum, for treatment of depressive symptoms. (Tr. at 240). Simmons reported sleep disturbances, mood swings and crying spells. (Tr. at 240). Dr. Rosenbaum prescribed Celexa [6]. (Tr. at 201). Later that month, Simmons reported to Dr. Rosenbaum that she was feeling better with no more crying spells. (Tr. at 239).

On May 24, 2007, Simmons was seen by Dr. Houtchens on a follow-up exam. (Tr. at 197). Simmons reported fatigue as well as pain and numbness in her legs. (Tr. at 197). As a result, Simmons expressed difficulty doing work, noting one instance where she was unable to function and get out of bed. (Tr. at 197). Dr. Houtchens noted a largely normal neurological exam with relatively mild physical weakness. (Tr. at 197). It was Dr. Houtchens' opinion that there was no primary strength deficit. (Tr. at 197).

On September 18, 2007, Simmons underwent a neuropsychological assessment by Dr. Meghan Searl. (Tr. at 187–95). Simmons reported problems concentrating as well as changes in her levels of interest and motivation. (Tr. at 187–88). She also described periods of social withdrawal and crying. (Tr. at 187–88). Simmons noted that she smoked marijuana daily to "take the edge off" and to relax and sleep. (Tr. at 188).

On exam, Dr. Searl noted that Simmons mood was bright and her affect was full. (Tr. at 190). She appeared alert, attentive, and oriented. (Tr. at 190). According to Dr. Searl, Simmons was not easily distracted and she did not frustrate or fatigue easily. (Tr. at 190). Dr. Searl concluded that Simmons was quite bright and Dr. Searl did not see any deficits whatsoever other than mild weakness in sustained attention. (Tr. at 192). Dr. Searl recommended consultation with a psychiatrist or neuropyschitrist to help Simmons con-

---

**5.** The term "clinically isolated syndrome" (CIS) has been used to describe a first neurologic episode that lasts at least 24 hours, and is caused by inflammation/demyelination in one or more sites in the central nervous system (CNS). National Multiple Sclerosis Society, *Clinically Isolated Syndrome,* http://www. nationalmssociety.org/about-multiple-sclerosis/what-we-know-about-ms/diagnosing-ms/cis/index.aspx (last visited Sept. 7, 2010).

**6.** Celexa is indicated for the treatment of depression. *See Physician's Desk Reference* 1293 (57th ed. 2005).

struct a behavioral approach to her motivational treatment. (Tr. at 192). In addition, Dr. Searl suggested that Simmons' daily use of marijuana may be significantly impacting her motivation, interest, energy levels and mood. (Tr. at 192).

On October 3, 2007 Simmons saw Dr. Neal on a followup. (Tr. at 266). Simmons reported that she had been unable to work since August as a result of fatigue, reduced emotions, reduced ability to respond to stimuli and depression. (Tr. at 266). On exam, Simmons was alert and awake and showed no impairment in cognitive or language function. (Tr. at 266). Dr. Neal noted that Simmons' strength and muscle reflexes were normal and opined that Simmons had prominent fatigue and other symptoms possibly related to depression. (Tr. at 266).

On November 28, 2007 Simmons saw Dr. Houtchens and complained of depressive periods where she could not do simple things like grocery shopping and picking up the mail. (Tr. at 185). Dr. Houtchens noted that the neurological exam was entirely normal. (Tr. at 185). He suggested a referral to Dr. Melissa Frumin for a therapy consultation regarding possible bipolar disease. (Tr. at 185).

On December 18, 2007 Simmons saw neurologist Dr. Keith McAvoy and reported endurance related issues as well as "Novocain-type sensations" radiating from her back to her abdomen. (Tr. at 340). On exam, Dr. McAvoy noted that Simmons was alert and oriented and that her mental status was intact. (Tr. at 341). Simmons' motor strength was 5/5 throughout and her coordination was good. (Tr. at 341). Dr. McAvoy did not find any deficiencies on the neurological exam with respect to weakness, balance difficulties, or coordination. (Tr. at 342). Deep tendon reflexes were 2/4 in the upper extremities and 1/4 in the lower extremities. (Tr. at 341).

Simmons requested a rolling walker, which Dr. McAvoy provided to her. (Tr. at 342). Dr. McAvoy suggested ongoing management with a psychiatrist or counselor. (Tr. at 342).

On February 25, 2008, Simmons underwent a neuropsychiatric evaluation with Dr. Frumin based upon Dr. Houtchens' referral for bipolar disorder. (Tr. at 318). Dr. Frumin noted that Simmons' mood was happy and optimistic, and her thought process was logical and coherent. (Tr. at 319). In Dr. Frumin's opinion, Simmons affective disorder predated her diagnosis of multiple sclerosis and he suggested that Simmons' marijuana use may be contributing to her apathy and mood instability. (Tr. at 319). He recommended that Simmons start a mood stabilizer and possibly an antidepressant. (Tr. at 319).

On April 2, 2008 Simmons had a followup appointment with Dr. McAvoy. (Tr. at 378). Simmons reported Dr. Frumin's opinion that she only had mild depression. (Tr. at 378). Simmons expressed concern regarding Dr. Houtchens' belief that a diagnosis of multiple sclerosis was not certain. (Tr. at 378). Dr. McAvoy stated his opinion that the diagnosis of multiple sclerosis was not in question. (Tr. at 378).

On May 8, Simmons saw Dr. Rosenbaum and complained of fatigue and saddle anesthesia. (Tr. at 386). Simmons also expressed her desire to discontinue use of her Celexa. (Tr. at 386). Dr. Rosenbaum disagreed with discontinuing the antidepressant, but relented after Simmons expressed her strong desire to due so. (Tr. at 387).

Over the next few months, Simmons saw Dr. Rosenbaum and reported improvement since stopping Celexa. (Tr. at 389). Dr. Rosenbaum noted that she had been doing well over the past several months and her

complaints had generally been mild. (Tr. at 403).

On September 19, 2008 Simmons had a followup appointment with Dr. McAvoy. (Tr. at 368). Simmons noted that her symptoms had improved significantly since June. (Tr. at 368). On exam, Dr. McAvoy noted that Simmons' motor strength and coordination was good, her gait was steady, and no abnormalities in her abdominal reflexes were noted. (Tr. at 368). Dr. McAvoy's assessment was probable multiple sclerosis with possible anxiety. (Tr. at 368–69). Dr. McAvoy continued Simmons on Rebif[7] for the indefinite future and ordered repeat MRI scans. (Tr. at 369).

On January 3, 2009, Simmons underwent an MRI scan of her brain. (Tr. at 396–97). The scan revealed no indication of white matter disease and no significant changes since her December 2007 scan. (Tr. at 396–97). Later that month Simmons underwent an MRI scan of her spine. (Tr. at 398–400). The MRI scan revealed no changes since her December 2007 scan. (Tr. at 398–400).

On January 19, 2009, Simmons has a followup visit with Dr. McAvoy. (Tr. at 422–24). Simmons noted that while her fatigue had improved, she continued aching and numbness in her torso. (Tr. at 422). Simmons also noted trouble concentrating. (Tr. at 422). On exam, Dr. McAvoy observed that Simmons was alert, her motor strength and coordination was good, her muscle tone was normal, and her gait was steady. (Tr. at 423). The MRI scans were unchanged when compared with prior studies. (Tr. at 423). Dr. McAvoy continued to prescribe Rebif and neither Simmons nor Dr. McAvoy felt that any

additional medication was needed. (Tr. at 423).

### D. *Opinion Evidence*

On March 3, 2008, state agency physician Dr. Joseph Cataldo reviewed the evidence in the record and completed a Physical RFC assessment. (Tr. at 345–52). Dr. Cataldo determined that Simmons could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for a total of six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and do unlimited pushing and pulling. (Tr. at 346).

On March 25, 2008, state agency physician Dr. Nicholas Kalfas reviewed the evidence in the record and completed a Psychiatric Review Technique form. (Tr. at 353–66). Dr. Kalfas opined that Simmons had a non-severe affective disorder. (Tr. at 353, 356). Dr. Kalfas further determined that Simmons had mild restrictions in her activities of daily living, mild restrictions in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. at 363).

### E. *Function Reports*

In an undated Disability Report submitted to the Commissioner, Simmons noted that multiple sclerosis, fatigue, depression, cognitive dysfunction, weakness, and pain limited her ability to work. (Tr. at 112). She stated that fatigue was her greatest challenge, preventing her from doing more than meeting her own basic needs. (Tr. at 112). Simmons also reported that she often was unable to focus on a conversation, retain details, or organize information. (Tr. at 112).

---

**7.** Rebif is indicated for the treatment of patients with relapsing forms of multiple sclerosis to decrease the frequency of clinical exacerbations and delay the accumulation of physical disability. *See Physician's Desk Reference* at 2624.

In a Function Report dated February 2, 2008, Simmons wrote that her daily activities on a "bad day" included barely eating, taking her medications, and showering. (Tr. at 144). Her activities on a "good day" included making meals for herself and her spouse, resting, checking e-mails, paying household bills, doing light chores, working, showering, doing laundry, watching television, and using the internet. (Tr. at 153). Simmons reported using a cane or a rolling walker when walking a long distance. (Tr. at 154).

### F. *Hearing Testimony*

At the administrative hearing on March 26, 2009, Simmons stated that her multiple sclerosis had caused basic tasks, such as handling paperwork, writing, and using the computer, to become challenging. (Tr. at 26–28). Simmons indicated that on an everyday basis, she is able to do some chores such as laundry, though not as many loads as she would like. (Tr. at 32). Her daily activities include eating and taking care of herself, cooking meals, keeping up on laundry, and raking in nice weather. (Tr. at 32–33). She is able to move around, but needs to rest after walking or being active. (Tr. at 33).

Simmons also noted trouble dealing with stimulation. (Tr. 33–34). She drove herself to the hearing, which took 45 minutes, but otherwise does not drive often. (Tr. at 34). Simmons noted that she currently does not have a lot of pain. (Tr. at 32).

Simmons' husband also testified at the hearing, stating that since developing multiple sclerosis, Simmons has had trouble getting up the stairs and carrying on a conversation with more than two people. (Tr. at 39). He noticed a dramatic change from the past, when she worked hard and was very busy. (Tr. at 39–40).

### G. *ALJ's Decision*

In her June 3, 2009 decision, the ALJ followed the five-step sequential evaluation process established by the Commissioner for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2009). At step one, the ALJ found that Simmons had not engaged in substantial gainful activity since her alleged onset date of September 15, 2005. *See* 20 C.F.R. § 404.1520(a)(4)(i); (Tr. at 14). At step two, the ALJ found that Simmons' multiple sclerosis constituted a severe impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii); (Tr. at 14–15). At step three, the ALJ found that Simmons' multiple sclerosis did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(a)(4)(iii); (Tr. at 15). The ALJ then determined that Simmons retained the RFC to perform substantially the full range of sedentary work, with the exception that she should avoid excessive heat. *See* 20 C.F.R. § 404.1520(e); (Tr. at 15–17). At step four, the ALJ found that Simmons could not perform any of her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); (Tr. at 17). At step five, the ALJ relied on section 201.28 of the Commissioner's Medical Vocational Guidelines ("the Grid") in determining that a significant number of jobs existed in the national economy that Simmons could perform in spite of her multiple sclerosis. *See* 20 C.F.R. § 404.1520(a)(4)(v); (Tr. at 17–18).

The Appeals Council ultimately denied review. Thus, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.905, 404.987(a).

### II. *STANDARD OF REVIEW*

An individual seeking social security benefits has a right to judicial review of a decision denying her application. *See*

42 U.S.C. § 405(g). I am empowered to affirm, modify, reverse or remand the decision of the Commissioner based upon the pleadings submitted by the parties and the transcript of the administrative record. *See id.* However, my review is limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence. *See Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir.2000).

■■■ The factual findings of the Commissioner are conclusive if they are supported by "substantial evidence." See *id.* Substantial evidence is evidence which a "reasonable mind, reviewing the evidence in the record as a whole, could accept … as adequate to support [the] conclusion." *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981). I do not have to agree with the Commissioner's judgment, instead my review is limited to a determination of whether the ALJ's decision is supported by substantial evidence. *See Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 770 (1st Cir.1991).

■■ In addition, it is "the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence." *Id.* at 769. It is the role of the ALJ, and not the role of this court, to resolve conflicts in the evidence. *Id.*

### III. *ANALYSIS*

Simmons challenges the ALJ's decision at step 3 that her disability did not meet the criteria for multiple sclerosis contained in Listing 11.09(C). In addition, Simmons contends that the ALJ erred at step 5 by relying solely on the Grid, and instead should have obtained the testimony of a vocational expert. I address each argument in turn.

### A. *The ALJ's Listing Determination*

■■■ At step three in the five-step sequential process, an ALJ determines whether a claimant's severe impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets the pertinent listing, then that individual is found to be "disabled." *See id.* Listing 11.09 deals specifically with multiple sclerosis. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09. Listing 11.09(C), upon which the Simmons relies, requires that a claimant with multiple sclerosis suffer from "[s]ignificant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09(C).

Simmons faults the ALJ's determination at step 3 because it fails to consider Dr. McAvoy's finding that her deep tendon reflexes were 2/4 and 1/4 in the upper and lower extremities respectively. (*See* Tr. at 341). Simmons contends that this test, considered with her multiple sclerosis, effectively demonstrated the significant fatigue of motor function or substantial muscle weakness required by the Listing.

There is nothing in the record to suggest, however, that either the deep tendon reflex test or the overall exam established a deficiency in muscle strength or motor function. (*See* Tr. at 341). During the same exam, Dr. McAvoy noted that Simmons' motor strength was 5/5 throughout and her neurological exam did not reveal any problems with respect to weakness, balance difficulties, or coordination. (Tr. at 341–42). Therefore, in the context of

this particular exam, the ALJ reasonably could have concluded that the deep tendon reflex test standing alone was not sufficient to indicate "substantial muscle weakness" or "significant muscle fatigue." *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09(C);(Tr. at 341–42).

Moreover, even if Dr. McAvoy's exam did indicate a potential deficiency, his exam by itself does not demonstrate the "reproducible" fatigue of motor function required by the listing. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09(C). In the remaining evaluations conducted by Simmons' treating physicians, Simmons consistently exhibited normal energy level, awareness, strength, muscle tone, reflexes, gait, etc. (*See* Tr. at 185, 208, 280, 284, 286, 294, 300, 341, 368, 423). Therefore, the ALJ's determination that Simmons' multiple sclerosis did not meet Listing 11.09(C) is supported by substantial evidence. *See Ward,* 211 F.3d at 655; *Irlanda Ortiz,* 955 F.2d at 769.

**B.** *The ALJ's Reliance on the Grid*

■ At step five, the burden shifts to the Commissioner to prove that the claimant can make an adjustment to other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(v). In making this determination, the ALJ must consider the claimant's RFC, age, education and work experience. *Id.* The Grid is designed to streamline the Commissioner's burden of proving the existence of other jobs in the economy that the claimant can perform without requiring the use of a vocational expert. *Ortiz v. Sec'y of Health & Human Servs.,* 890 F.2d 520, 524 (1st Cir.1989). If a claimant, based upon his or her RFC, can perform all or substantially all of the exertional demands at a given level of exertion, the Grid directs a finding of "not disabled." [8] *See* 20 C.F.R. § 404.1520(a)(4)(v).

■ In this case, the ALJ determined that Simmons retained the ability to perform the full range of sedentary work with the exception that she should avoid excessive heat. (Tr. at 15). Based on this RFC and Simmons' age (42), education (high school graduate) and work experience (skilled, semi-skilled and not transferrable), Medical Vocational Rule 201.28 of the Grid directed a finding of "not disabled." *See* 20 C.F.R. Part 404, Subpart P, App. 2, § 201.00; (Tr. at 18).

In the present case, the ALJ concluded that he could rely on the Grid rather than a vocational expert to determine that Simmons was not disabled because Simmons' RFC permitted her to perform the full range of sedentary activity without restriction and she otherwise met the age, education, and work experience requirements for the use of the Grid. Simmons challenges the ALJ's decision to rely on the Grid because she contends that the decision was based on the incorrect premise

---

**8.** Because the Grid is based on a claimant's exertional capacities, it "can only be applied when claimant's non-exertional limitations do not significantly impair claimant's ability to perform at a given exertional level." *Rose v. Shalala,* 34 F.3d 13, 19 (1st Cir.1994). Simmons does suffer from certain nonexertional limitations including fatigue, depression, and lack of concentration. However, as Simmons has not specifically raised these as a basis for her challenge of the ALJ's decision, they are not addressed here. *See Stoll v. Principi,* 449 F.3d 263, 267 (1st Cir.2006)(claim not raised is abandoned). In any event, sufficient evidence exists in the record to support a finding that Simmons' complaints regarding the severity of her fatigue, depression and other nonexertional limitations were not entirely credible and therefore not significant enough to preclude reliance on the Grid. *See Ortiz,* 890 F.2d at 524; *Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir. 1987); (Tr. at 192, 363).

that she can perform the full range of sedentary work. In support of this argument, Simmons claims that the ALJ failed to properly consider: the waxing and waning nature of multiple sclerosis, the treatment records of Dr. Houtchens and Dr. McAvoy, and her own statements at the hearing.

### 1. *Consideration of the Waxing and Waning Nature of MS*

First, Simmons argues that the ALJ failed to take into account the waxing and waning nature of multiple sclerosis. Simmons' complaints to her treating physicians regarding the severity of her symptoms have often varied. (*See* Tr. at 280, 281, 284, 286, 294). During certain periods, Simmons has reported little to no symptomatic effects. (*See* Tr. at 281, 286 389, 403). However, during periods of exacerbation Simmons has complained of fatigue, numbness and difficulty concentrating. (*See* Tr. at 197, 284, 294–95). In her Function Report, Simmons highlighted a sharp dichotomy between "good days" and "bad days." (Tr. at 144–45). Simmons stated that her daily activities on bad days were limited to barely eating, taking her medications and showering, however on good days her activities included checking email, paying bills, and doing light chores around the house. (Tr. at 144–45).

While the ALJ did not specifically address the waxing and waning nature of multiple sclerosis in her decision, the ALJ did evaluate the severity of Simmons' ailments and restrictions as they were experienced during periods of exacerbation. (*See* Tr. at 15–16). In doing so, the ALJ determined that Simmons' statements regarding the intensity and limiting effects of her symptoms were not credible. (Tr. at 16).

As noted above, the ALJ's credibility determination is entitled to deference, es-

pecially when supported by specific evidence. *See Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir.1987) ("[t]he credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings"). In evaluating the severity of a claimant's alleged symptoms, the ALJ must first determine the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *See* 20 C.F.R. § 404.1529(b). Once an impairment is established, the ALJ will consider all available evidence including objective medical evidence, the opinions of a claimant's treating or nontreating sources, and statements by the claimant regarding their symptoms. *See* 20 C.F.R. § 404.1529(c)(1)-(3). The ALJ will also consider any inconsistencies in the record and "any conflicts between [the claimant's] statements and the rest of the evidence ... including [the] laboratory findings, and statements by [the claimant's] treating, or nontreating sources." 20 C.F.R. § 404.1529(c)(4).

In Simmons' case, the ALJ determined that multiple sclerosis could reasonably be expected to produce her fatigue and other symptoms. (Tr. at 15). The ALJ then discounted Simmons' complaints because she determined that Simmons' symptoms were not consistent with evidence in the record. (Tr. at 15–16).

Simmons has consistently noted fatigue as her primary ailment. (*See* Tr. at 150–55, 191, 197, 273, 284, 381). In addition, Simmons has complained of episodes of numbness, depression and difficulty concentrating. (*See* Tr. at 191, 197, 207, 216, 284). However, the various evaluations done by Simmons' treating physicians after the discovery of the intramedullary

lesion have consistently failed to corroborate her claims of fatigue and weakness or indicate further exacerbation of the disease. (Tr. at 16, 185, 191, 197, 208, 280, 284, 286, 294, 300, 341, 368, 423).

The majority of the physical and neurological exams that have been conducted have indicated normal functionality. (Tr. at 16, 185, 192, 197, 208, 280, 284, 286, 294, 300, 341, 368, 423). In the physical evaluations conducted by Simmons' treating physicians she has consistently exhibited normal energy level, awareness, strength, muscle tone, reflexes, gait, etc. (Tr. at 185, 208, 280, 284, 286, 294, 300, 341, 368, 423). In addition, the neuropsychological and neuropsychiatric exams have noted a euthymic mood with Simmons appearing attentive and oriented. (Tr. at 192, 318–19). In the exam conducted by Dr. Searl, Dr. Searl noted that Simmons was note easily distracted and Dr. Searl "did not see any deficits whatsoever." (Tr. at 192).

In addition, the subjective evidence was not entirely consistent with Simmons' allegations. *See* 20 C.F.R. § 404.1529(c)(3); (Tr. at 17). In particular, the ALJ recounted Simmons' testimony that she does not experience a lot of pain and that she is able to perform a variety of household chores such as laundry and driving to errands and appointments. (*See* Tr. at 17).

Finally, the opinion of the non-treating state agency medical consultants do not corroborate the severity of Simmons' alleged symptoms. (*See* Tr. at 17). After reviewing Simmons' medical records and other evidence, it was the opinion of the state agency medical consultant who conducted the Physical RFC assessment that Simmons could perform the full range of light work. (Tr. at 345–52). In addition, the state agency physician who conducted the Psychiatric Review opined that Simmons has a non-severe affective disorder with only mild restrictions in daily living,

maintaining concentration, persistence or pace. (Tr. at 353–63).

Based on Simmons' treating physicians' notes, the objective medical evidence, the subjective evidence and the state agency medical consultants' opinions, substantial evidence in the record supports the ALJ's determination that the alleged intensity and severity of Simmons' fatigue and other symptoms during periods of exacerbation was not entirely credible. (*See* Tr. at 16–17). As such, the ALJ was justified in her determination that Simmons' fatigue and other non-exertional symptoms do not impose significant limitations on the range of work Simmons is exertionally able to perform. *See Ortiz*, 890 F.2d at 524. Therefore her reliance on the Grid was appropriate.

### 2. *Treating Physicians' Opinions*

In addition, Simmons claims that the ALJ failed to give weight to the opinions of Dr. Houtchens and Dr. McAvoy. In making a disability determination, an ALJ must consider medical opinions in the case record. *See* 20 C.F.R. § 404.1527(b). In evaluating various medical opinions, the ALJ will generally give greater weight to treating physicians, as these sources provide a more detailed and longitudinal picture than individual or consultive examinations. *See* 20 C.F.R. § 404.1527(d)(1)-(2).

In this case, both Dr. Houtchens and Dr. McAvoy are treating physicians. Therefore, their opinions are customarily given significant weight in the ALJ's determination. *See id.* However, contrary to Simmons' complaint, the ALJ's decision reveals consideration of each physician's opinion. (*See* Tr. at 16–17). Her conclusion that Simmons suffered from multiple sclerosis, and the determination that the impairment was severe was based on the evaluations of her treating physicians including Dr. McAvoy and Dr. Houtchens.

(*See* Tr. at 14). Indeed, this determination was likely based specifically on the opinion of Dr. McAvoy, who provided the most certain diagnosis of multiple sclerosis. (*See* Tr. at 378). In contrast, Dr. Houtchens remained uncertain of a diagnosis of clinically definite multiple sclerosis. (*See* Tr. at 208, 378).

By the same token, the evaluations of both Dr. Houtchens and Dr. McAvoy were also considered by the ALJ in her determination that the severity of Simmons' purported symptoms were not entirely credible. (*See* Tr. at 16, 185, 197, 207–08, 340–42, 368). As noted above, each physician's evaluations of Simmons consistently noted normal physical and neurological exams. (*See* Tr. at 16, 185, 197, 207–08, 340–42, 368). On several independent exams, both doctors noted that Simmons exhibited normal muscle tone, alertness and orientation. (*See* Tr. at 185, 208, 341). As discussed above, the ALJ weighed these examinations and determined that Simmons' statements regarding the severity of the symptoms were not credible. (*See* Tr. at 16). Therefore, the ALJ considered Dr. Houtchens' and McAvoy's exams and opinions, and made a determination that based on these exams, and not in spite of them, Simmons' alleged symptoms were not entirely credible. (*See* Tr. at 15–17). The ALJ did not err in failing to give sufficient weight to these treating source opinions. *See* 20 C.F.R. § 404.1527(d); (Tr. at 15–17).

### 3. *Simmons' Testimony & Credibility*

Finally, Simmons contends that the ALJ "misapprehended" her testimony regarding her pain and her ability to perform household chores. In support of her contention, Simmons points to additional testimony from the administrative hearing where she explained how fatigue and other symptoms limit her daily activities. (*See* Tr. at 32–35).

As previously noted, credibility determinations are made by the ALJ and are ordinarily entitled to deference when supported by specific evidence. *See Frustaglia*, 829 F.2d at 195. In evaluating Simmons symptoms, the ALJ considered all available evidence in accordance with the applicable regulations. *See* 20 C.F.R. § 404.1529(c)(1)-(4); (Tr. at 15–17). As noted above, there was substantial evidence based upon Simmons' medical records, her treating physicians exams and opinions, the non-treating state agency physicians and Simmons' own subjective evidence to support the ALJ's credibility determination. *See* 20 C.F.R. § 404.1529(c)(1)-(4); (Tr. at 15–17). As such, the ALJ's determination that the alleged severity of Simmons' symptoms and testimony were not sufficiently credible is entitled to deference. *See Frustaglia*, 829 F.2d at 195.

### IV. *CONCLUSION*

The ALJ's decision is supported by substantial evidence in the record. Therefore, the court is without the authority to overturn it. The motion for order affirming the decision of the Commissioner (Doc. No. 12) is granted, and the plaintiff's motion for order reversing the decision of the Commissioner (Doc. No 11) is denied. Accordingly, the clerk shall enter judgment and close the case.

SO ORDERED.